STATE ex rel. Lawrence SPERANDIO,
Relator,

v.

Honorable Lewis W. CLYMER, Judge,
16th Judicial Circuit, Respondent.

No. 60411.

Supreme Court of Missouri,
En Banc.

May 17, 1979.

John C. Milholland, Harrisonville, E. J. Murphy, Butler, for relator.

Jack G. Beamer, Jerry M. Drewry, McKenzie, Williams, Merrick, Beamer & Wells, Kansas City, for respondent.

SIMEONE, Judge.

This is an original proceeding in mandamus brought by relator Lawrence Sperandio against the respondent, judge of the 16th circuit, commanding him to set aside an order of dismissal made on September 19, 1977, dismissing a Utah physician from a cause pending in the court. We have original jurisdiction. Art. V, § 4, Mo.Const.

Relator, Mr. Sperandio asserts that the service of process on Dr. Paul Pemberton, a Utah physician, was proper under the provisions of § 506.500, RSMo 1969 (Rule 54.06) which reads in part as follows:

"1. Any person or firm, whether or not a citizen or resident of this state, or any corporation, who in person or through an agent does any of the acts enumerated in this section, thereby submits such person, firm, or corporation, and, if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of such acts:

\*     \*     \*     \*     \*     \*

"(3) The commission of a tortious act within this state;".

Mr. Sperandio suffered from a pain producing but non-disabling condition of subluxation of his hip joints. Upon referral by his family physician on or about September 12, 1967, he consulted and engaged the services of Dr. Harvey R. Michael and Dr. Daniel L. Yancey concerning the condition. The petition filed by plaintiff alleges that Drs. Michael and Yancey told plaintiff that he was afflicted with a deformity of his hips "with a resulting condition of subluxation of the femoral heads" and that unless he submitted to surgery to remedy the condition, the pain would grow progressively worse.

On September 14, 1967, Dr. Michael forwarded a letter to Dr. Paul Pemberton, an orthopedist in Salt Lake City, Utah. Dr. Pemberton is apparently an expert in a surgical operation procedure which he developed and which is commonly called the "Pemberton Procedure." This procedure was developed for use on children. In the letter, Dr. Michael wrote that during his residency at medical school he became interested in the problem of "congenital hip dislocation." He informed Dr. Pemberton that Mr. Sperandio represents "an old congenital dysplasia with residual shallow acetabula." The letter described the condition of Mr. Sperandio and referred to x-rays which were also forwarded. The letter indicated subluxation of both femoral heads. Dr. Michael asked Dr. Pemberton his "opinion" as to "what you think the etiology of his present hip problem is as well as what you would consider the most satisfactory treatment. I know that you have mentioned, during your visits to Oklahoma City, [where Dr. Michael was a resident and where Dr. Pemberton made instructive visits] doing periaceabular osteotomy in adults. I think I am fairly familiar with this proce-

dure in children, but I know that the operation must be altered when done in the adult patient. I would like, first of all, to have your opinion as to whether you feel this operation is indicated in this particular patient, and secondly, what alterations in the procedure are necessary in the adult." The letter to Dr. Pemberton was unsolicited.

On September 21, 1967, Dr. Pemberton replied to Dr. Michael. He concurred in Dr. Michael's opinion that there was a "bilateral congenital subluxation" of the hip. "The problem as to what should be done here in a man of this age . . . is a serious one . . . . The operation that I have been doing in the adult has been a modification of the one that I have developed for the congenital hip in a child . . . ." Dr. Pemberton then described the technique of an operation in an adult. On the x-rays he drew "this out on the left hip" and returned the x-rays to Dr. Michael. In the letter, he cautioned Dr. Michael as to certain matters. He indicated that post-operative care would be about what it was in children with two months in a cast and then crutches for about another thirty days. He stated that "I have done quite a number of these now and they have worked out well." He concluded the letter by stating "Let me know if there is any other question you have about this and also if you do go ahead with this procedure, I would like to hear from you as to how it works out." There is nothing in the record to indicate that Dr. Pemberton received any fee.

On December 2, 1967, Mr. Sperandio submitted to surgery upon his left hip performed by Drs. Michael and Yancey. When he was discharged, it was alleged that Sperandio had an infection at the operative site. Not satisfied with the results of the operation, Sperandio filed suit in November, 1969 against Drs. Michael and Yancey in Greene County. In 1972 a deposition was taken of Dr. Pemberton in Utah, and Sperandio's counsel was present. During the course of the deposition, Dr. Pemberton (1) in response to a question whether he felt that the letter and x-rays were adequate to diagnose that Mr. Sperandio had congenital hip dysplasia, answered, "yes", (2) stated that the lines on the x-ray indicates the site of the osteotomy which he recommended, and (3) said ". . . it looks like the bones are where they ought to be."

Relator learned in May, 1974 that the hip bones remained subluxated and that the surgery had not corrected the condition. He then joined Dr. Pemberton as a defendant in the Greene County suit. This suit was dismissed and on January 3, 1975, Sperandio filed the present action against Drs. Michael, Yancey, Pemberton and others in two counts in Jackson County. The first count was based on medical malpractice and the second count was based on a conspiracy to prevent relator from learning of his true residual condition. Service of process was had on Dr. Pemberton in Utah and Dr. Pemberton moved to quash the process alleging that he has never been a resident of Missouri and the only contact between him and other defendants was the letter of September 14 and his response.[1] Jurisdiction was predicated on § 506.500, and Rule 54.06. On March 7, 1975 the judge sustained Pemberton's motion to quash. Some two years later, in June, 1977, relator sought mandamus in the Court of Appeals, Western District to reinstate service of process, which was denied on June 23, 1977.

Service of process was again served on Dr. Pemberton in Utah on August 3, 1977. Dr. Pemberton filed a "motion to dismiss" in which he, "appearing specially for purposes of this motion and for no other rea-

---

1. In an affidavit in support of the motion to quash, Dr. Pemberton stated that he was in the medical corps stationed at Jefferson Barracks from March, 1943 to February, 1944, but had not been present in Missouri at any other time. He indicated he received the letter from Dr. Michael but heard nothing further until advised of the law suit. He stated that he did not see, examine or treat Mr. Sperandio and did not consult with the other physicians except for the two letters. He was not acquainted with Dr. Michael prior to receiving the letter and never met him prior to the date of the letter. The letter to Dr. Michael was gratuitous he was not paid or promised any compensation "for the letter or for any other matters pertaining to Mr. Sperandio."

son," moved the court to dismiss him from the case because (1) he was discharged from the lawsuit on March 7, 1975; (2) relator sought a writ of mandamus in the court of appeals which was denied; the petition served on him on August 3, 1977 was the same petition as previously served on defendant and there is "nothing before the court to indicate that any fact has changed" hence the matter is res judicata so as to prevent plaintiff from proceeding further against Dr. Pemberton. On September 19, 1977, respondent judge sustained the motion to dismiss ordering that "Paul A. Pemberton is dismissed from the captioned petition with prejudice to plaintiff refiling against defendant Pemberton in the State of Missouri."

It is this order that relator seeks to set aside and to command the respondent to proceed to exercise jurisdiction over the person of Dr. Pemberton. The petition for mandamus was sought in this court on October 17, 1977. Attached to the petition were several exhibits including the petition in damages in two counts.[2] On November 14, 1977, we issued our alternative writ, and pleadings joined issue.[3]

On April 10, 1978, we handed down an opinion in which it was held that the alternative writ be made peremptory because there were sufficient minimum contacts with Missouri to make Dr. Pemberton amenable to service of process in this state. *State ex rel. Sperandio v. Clymer*, 568 S.W.2d 935 (Mo. banc 1978). In that opinion we held that there were sufficient minimum contacts to satisfy due process under *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945),

since (1) Missouri has an interest in securing redress for its citizen who had had no contact with Utah and who was injured in Missouri and (2) Dr. Pemberton's acts were performed for the purpose of causing an effect in Missouri.

After a petition for writ of certiorari to the Supreme Court of the United States, that court on October 2, 1978, 436 U.S. ——, 99 S.Ct. 69, 58 L.Ed.2d 103 vacated the judgment of this court and remanded the cause "for further consideration in the light of [*Kulko v. Superior Court of California, Etc.*, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978)].

"Historically the jurisdiction of courts to render judgment in personam is grounded on their de facto power over the defendant's person. Hence his presence within the territorial jurisdiction of a court was prerequisite to its rendition of a judgment personally binding him. *Pennoyer v. Neff*, 95 U.S. 714, 733, 24 L.Ed. 565. But now that the capias ad respondendum has given way to personal service of summons or other form of notice, due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co., supra*, 66 S.Ct. at 158.

In *State ex rel. Deere and Company v. Pinnell*, 454 S.W.2d 889, 892 (Mo. banc 1970), this Court declared that the ultimate objective of § 506.500 "was to extend the jurisdiction of the courts of this state over

2. Count I was based on medical malpractice. The petition alleged that Drs. Michael and Yancey, prior to "committing" surgery on plaintiff, "consulted" with Pemberton and Pemberton "undertook" to offer them education and guidance in their use of the Pemberton Procedure and illustrated the direction and extent of the operation; that Michael and Yancey relied upon the advice; that Pemberton carelessly and negligently failed to properly instruct the physicians in the modification of the technique used in children, and that the negligence of Pemberton combined with the negligence of

Michael and Yancey caused plaintiff's damage. In Count II, plaintiff alleged that the defendants misrepresented and concealed from him the true nature and quality of the care and concealed the fact they had failed to achieve the purpose of the surgery to cure the condition of subluxation and the hip continued to be subluxated.

3. A motion to quash the alternative writ was filed and a motion to dismiss the mandamus proceeding because relator's brief failed to comply with Rule 84.04 was also filed.

nonresident defendants to that extent permissible under the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States."

But despite the expansion of in personam jurisdiction, *McGee v. International Life Insurance Company*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), state courts must heed the admonition of the Supreme Court that " 'the flexible standard of *International Shoe*' " does not " 'herald the eventual demise of all restrictions on the personal jurisdiction of state courts.' " *Kulko*, 98 S.Ct. at 1701, quoting from *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

*Kulko* is the latest Supreme Court decision discussing and delineating the exercise of in personam jurisdiction over a nonresident.

The precise issue in *Kulko* was whether in an action to increase child support, the state of California may exercise in personam jurisdiction over a nonresident father of a minor child. Ezra and Sharon Kulko were married in 1959 in California during a stopover there enroute to a military base in Texas. They were domiciled in New York. Following the marriage, Sharon returned to New York. Two children were born of the marriage and the family lived in New York until 1972 when they separated. Following the separation, Sharon moved to California. A separation agreement was made under the terms of which the children would remain with their father during the school year but would spend certain vacations with their mother. A divorce was obtained in Haiti. The children resided with their father during the school year and with the mother during vacations. In 1973, when one of the children was to leave to spend Christmas vacation with her mother, she told her father that she wanted to remain in California after her vacation. The child commenced living with her mother in California and sometime later, the other child also came to California to stay with his mother. The mother commenced an action against the husband to modify the judgment of divorce to award her full custody

and to increase support obligations. Extraterritorial service was obtained upon the father in New York. The husband appeared specially and moved to quash the service. The California court denied the husband's motion to quash reasoning that by consenting to the children living in California, he had caused an effect in the state warranting the exercise of jurisdiction over him.

■ The Supreme Court reversed, and reviewed the expansion of in personam jurisdiction. The existence of personal jurisdiction depends upon the presence of reasonable notice to the defendant that an action has been brought and a sufficient connection between the defendant and the forum as to make it fair to require defense of the action in the forum.

" . . . [T]he constitutional standard for determining whether the State may enter a binding judgment against [a defendant] is that set forth in this Court's opinion in *International Shoe Co. v. Washington,* supra: that a defendant to be bound by a judgment against him must have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' . . . While the interests of the forum State and of the plaintiff in proceeding with the cause in the plaintiff's forum of choice are of course to be considered, . . . an essential criterion in all cases is whether the 'quality and nature' of the defendant's activity is such that it is 'reasonable' and 'fair' to require him to conduct his defense in that State." *Kulko*, 98 S.Ct. at 1697.

The court emphasized that the unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum state. " '[I]t is essential in each case that there be some act by which the defendant purposefully avails [him]self of the privilege of conducting activities within the forum State.' " Quoting from *Hanson v. Denckla, supra,* 78 S.Ct. at 1240.

In our opinion, the Supreme Court in *Kulko* held that (1) the father who agreed

to allow his children to spend more time in California can hardly be said to have purposefully availed himself of the benefit and protection of California laws, (2) the father did not derive any financial benefit as a result of his acquiescence in the daughter's desire to live in California, (3) the California court's reliance on the husband having caused an "effect"[4] in California was misplaced, since this is intended to reach wrongful activity outside the state causing an injury within the state[5], (4) the claim did not arise from the defendant's commercial transactions and hence cannot be said that commercial benefits were sought and (5) the sending of a child to California is not a commercial act and connotes no intent to obtain nor expectancy of receiving a corresponding benefit in the State that would make fair the assertion of that State's judicial jurisdiction.

In our opinion, *Kulko* does not announce new law. Rather, it relies on the long-established rules of *International Shoe* and *Hanson* that "a defendant 'have certain minimum contacts with [the forum State] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." '" (*Kulko*, 98 S.Ct. at 1693 quoting *International Shoe*). *Kulko* recognized that " '[I]t is essential in each case that there be some act by which the defendant purposefully avails [him]self of the privilege of conducting activities within the forum State . . . .'" (*Kulko*, 98 S.Ct at 1698, quoting *Hanson*). The Court stated "In light of our conclusion that appellant did not purposefully derive benefit from any activities relating to the State of California, it is apparent that the California

Supreme Court's reliance on appellant's having caused an 'effect' in California was misplaced." (*Kulko*, 98 S.Ct. at 1699).

*Kulko* also recognized that "Like any standard that requires a determination of 'reasonableness,' the 'minimum contacts' test of *International Shoe* is not susceptible of mechanical application; rather the facts of each case must be weighed to determine whether the requisite 'affiliating circumstances' are present." 98 S.Ct. at 1697.

■ While *Kulko* does not squarely govern this case, the legal similarities and the legal principles embodied therein are sufficient for us to conclude that under the circumstances here, Dr. Pemberton is not subject to jurisdiction *in personam* in Missouri. Under the facts here Dr. Michael had known of Dr. Pemberton since he was a resident physician; he wrote an unsolicited letter to Dr. Pemberton describing relator's condition and sought his opinion concerning a procedure to be used on an adult. Dr. Pemberton replied and suggested a technique and drew on the x-rays. As in *Kulko*, no commercial or financial benefit was received by Dr. Pemberton, nor was there any commercial transaction involved.[6] No fee was sought or requested or offered. There was no doctor-patient relationship between relator and Dr. Pemberton; nothing in the record indicates that Dr. Pemberton knew whether his suggested technique would be followed; there was no correspondence between Drs. Michael and Pemberton after the operation. The unsolicited letter of Dr. Michael and the response was akin to a discussion of a clinical problem similar to discussions among other professional

4. See American Law Institute's Restatement (Second), Conflicts, § 37 (1971).

5. Even in such situations the Restatement recognizes that there might be circumstances that would render unreasonable the assertion of jurisdiction over the nonresident defendant. In *Kulko*, it was said "There is no claim that appellant has visited physical injury on either property or persons within the State of California." 98 S.Ct. at 1699. Although there is such a claim here, the test is whether the assertion of jurisdiction over the nonresident is reasonable.

6. See e. g., *Sifers v. Horen*, 22 Mich.App. 351, 177 N.W.2d 189 (1970), *aff'd.* 385 Mich. 195, 188 N.W.2d 623 (1971)—except attorney discussed becoming associated with firm in a negligence case and prepared for trial; *Davis v. Superior Court, San Francisco*, 62 Cal.App.3d 484, 133 Cal.Rptr. 115 (1976)—Maryland physician who promoted book at medical conventions and had substantial financial interest was held subject to jurisdiction in California.

groups. Dr. Pemberton did not undertake to treat relator. It certainly cannot be said that Dr. Pemberton under the principles of *Kulko* and *Hanson,* purposefully availed himself of the privilege of conducting activities within the forum state to invoke the benefits and protection of its laws, nor can it be said that there were sufficient minimum contacts with Missouri so as to subject him to *in personam* jurisdiction.

■ Neither do we believe that although an "effect" took place in Missouri, that it is reasonable to assert jurisdiction over Dr. Pemberton. This is not a products liability situation or a case similar to *Nelson v. Miller,* 11 Ill.2d 378, 143 N.E.2d 673 (1957), or *Gray v. American Radiator & Standard Sanitary Corp.,* 22 Ill.2d 432, 176 N.E.2d 761 (1961). Although an "effect" may have taken place in Missouri because of the correspondence, opinion and suggested technique by Dr. Pemberton, this case is akin to decisions dealing with physicians where no *in personam* jurisdiction was obtained. *Wright v. Yackley,* 459 F.2d 287 (9th Cir. 1972); *McAndrew v. Burnett,* 374 F.Supp. 460 (D.C.Pa.1974); *Gelineau v. New York University Hospital,* 375 F.Supp. 661 (D.N.J.1974) and *Kailieha v. Hayes,* 56 Haw. 306, 536 P.2d 568 (1975).

In *Wright*[7], for example, the United States Court of Appeals held that Idaho did not acquire *in personam* jurisdiction over a South Dakota physician who treated the patient while a resident of South Dakota and who authorized the refill of a prescription. The court discussed the "effects" rule of the Restatement and whether it may apply that rule in such a fashion so as to confer jurisdiction. The court held it could not, and concluded that no tort was committed in Idaho.

The ultimate question, of course, is one of *reasonableness* of the forum state to acquire jurisdiction over a nonresident defendant. As to count I, we believe that in this protracted litigation there were not sufficient "minimum contacts" with Missouri to make Dr. Pemberton amenable to service of process here, nor do we believe that Dr. Pemberton purposefully availed himself of the privilege of conducting activities in Missouri thus invoking the benefits and protection of its laws.

■ Relator further contends that count II alleged a conspiracy to conceal from relator the fact that the surgery did not eliminate the subluxation and that the "charged conspirators" informed relator that the bones were placed in proper position so that jurisdiction was obtained.

The conspiracy count alleged (1) that defendants are participants in a widespread covert agreement made by many members of the medical profession to conceal knowledge of medical malpractice so that civil justice is defeated, (2) in the alternative, the defendants did intentionally misrepresent and conceal from plaintiff the true nature of the care rendered to him and that it had been proper, (3) *in addition* to the wrongful concealment of the facts supporting the claim against Pemberton, Drs. Michael and Yancey agreed to conceal all knowledge of the fact that they had failed to achieve the purpose of the surgery to cure the condition of subluxation and effectively deprived plaintiff of future care of the hip condition; (4) each of the defendants acted in concert in furtherance of the object of the conspiracy in concealing the true condition of the hip and as a direct result of the overt acts plaintiff has been deprived of necessary medical treatment; and (5) defendants continue to conceal the fact that the surgery did not remove the condition and falsely represented that such condition was corrected.

The relator relies on *Jack O'Donnell Chevrolet, Inc. v. Shankles,* 276 F.Supp. 998 (N.D.Ill.1967). In that case, plaintiff, Jack

7. The court in *Wright* stated: "The balance of factors involved in a due process determination might be different if a doctor could be said to have treated an out-of-state patient by mail or to have provided a new prescription or diagnosis in such a fashion. In that event, the forum state's interest in deterring such interstate medical service would surely be great." 459 F.2d 289, fn. 4. In the case at bar, Dr. Pemberton could not be said to be the treating physician.

O'Donnell Chevrolet, a dealership with its principal place of business in Illinois sold automobiles to defendant Shankles in Illinois. Shankles executed certain drafts upon the defendant Fort Payne Bank, an Alabama corporation. The drafts were forwarded to an Illinois Bank which in turn forwarded them to the Fort Payne Bank for payment. The Fort Payne Bank, in the regular course of business received the drafts and returned them unpaid because of insufficient funds in the account of Shankles. Count IV of the petition charged that Shankles and Fort Payne conspired to the end that the bank would honor and pay only these drafts drawn by Shankles which he or his agents gave authority to honor even though other drafts were properly payable. Plaintiff alleged that pursuant to the conspiracy the defendants caused the drafts payable to plaintiff not to be honored even though properly payable. Fort Payne Bank moved to quash a summons served on it in Alabama on the ground that the service is invalid because the District Court in Illinois lacks *in personam* jurisdiction. The court held that, assuming the allegations of Count IV to be true, "we believe that when declining to honor and delaying notice of dishonor of the checks payable to plaintiff, the Bank contemplated that such actions would cause injury to an Illinois corporation in Illinois. Conspiracy involves an element of scienter." 276 F.Supp. at 1002. The Bank, the court held, in dealing with an Illinois bank had available to it the benefit and protection of Illinois.

But under the allegations of this petition which are broad and varied, the record fails to show the allegation of any tortious act of Dr. Pemberton in Missouri, does not show that Dr. Pemberton had the minimum contacts with Missouri sufficient to confer jurisdiction in this state and does not show that the defendant had available to him the benefit and protection of Missouri. *Cf. Hardy v. Bankers Life & Casualty Co.,* 19 Ill.App.2d 75, 153 N.E.2d 269 (1958); *annot.,* 24 A.L.R.3d 532, 574 (1969).

Relator also contends that Dr. Pemberton by filing a motion to dismiss

suit waived service of process in Utah. The motion was a special one and moved the court to dismiss because Dr. Pemberton's previous motion to quash had been sustained in March, 1975 and that the matter was res judicata. While titled a "motion to dismiss" it was not a motion to dismiss for failure to state a claim. The general principle is that if a party takes any action which recognizes that the cause is in court and assumes an attitude that the jurisdiction of the court has been acquired, he is bound thereby and the action amounts to a general appearance. *See Germanese v. Champlin,* 540 S.W.2d 109, 113 (Mo.App.1976); *State v. Weinstein,* 411 S.W.2d 267, 273 (Mo.App.1967); and *State v. Hawkins,* 361 S.W.2d 852, 858 (Mo.App.1976). The "motion to dismiss" here did not recognize the jurisdiction of the court, was not intended as a motion to enter a general appearance, and did not amount to a general appearance subjecting Dr. Pemberton to the jurisdiction of the court for all purposes.

The alternative writ heretofore issued is quashed.

MORGAN, C. J., and BARDGETT, RENDLEN, SEILER and WELLIVER, JJ., concur.

DONNELLY, J., concurs in result.