S. R.

*v.*

THE CITY OF FAIRMONT, *etc.*

(No. CC922)

Decided July 29, 1981.

*Herbert G. Underwood, Irene M. Keeley, Steptoe and Johnson, Robert W. Dinsmore* for plaintiff.

*James McNeer, J. Michael McDonald, McNeer, Highland and McMunn,* for Wadhwa's Gyne and Infertility Services, Inc., a corp., and Saroj R. Wadhwa, M.D.

MILLER, JUSTICE:

This case involves a certified question relating to the correctness of the circuit court's dismissal of the defendant, Wadhwa's Gyne and Infertility Services, Inc., (Infertility Services), a Pittsburgh, Pennsylvania medical corporation, for lack of personal jurisdiction. We believe the circuit court incorrectly dismissed this defendant.

This medical malpractice action was filed by the plaintiff, S.R.,[1] against several defendants, alleging that an abortion was negligently performed on her and that her resultant injuries were compounded by a subsequent misdiagnosis of her condition and a failure to supply proper treatment at Fairmont General Hospital.

On February 22, 1980, plaintiff went to Pittsburgh, Pennsylvania to have an abortion performed at the

---

[1] In accordance with our practice in cases involving sensitive personal situations, we style the case using the party's initials. *Markey v. Wachtel,* ___ W. Va. ___, 264 S.E.2d 437, 439 n. 2 (1979); *J.B., v. A.B.,* ___ W. Va. ___, 242 S.E.2d 248, 250 n. 1 (1978).

Allegheny Reproductive Health Center (Allegheny Center). At that time, she was a student at Fairmont State College in West Virginia. After filling our routine forms relating to her background and condition, plaintiff saw Dr. Saroj R. Wadhwa, an obstetrician-gynecologist, who worked at the Allegheny Center.

The above information is contained primarily in the deposition of Dr. Wadhwa. This deposition was limited by the trial court to facts relative to personal jurisdiction under our Long-Arm Statute, W. Va. Code, 31-1-15. At the deposition, Dr. Wadhwa stated that she owned all of the stock in Infertility Services, a Pennsylvania medical professional corporation.[2] From her deposition it also appears that Dr. Wadhwa, acting through Infertility Services, contracted to render abortion services to the Allegheny Center and was paid for these services. These services had been rendered for approximately six months prior to plaintiff's abortion. The discovery record shows that Allegheny Center advertises its abortion services in the Fairmont area and lists a toll-free number in the Fairmont telephone directory. It also does the same advertising and has a toll-free telephone listing in the following northern West Virginia cities: Wheeling, Clarksburg and Morgantown. Allegheny Center does not dispute West Virginia's assertion of jurisdiction over it.

Whether Dr. Wadhwa had actual or constructive knowledge of this solicitation and advertising, due to the number of West Virginians served by the clinic does not fully appear in the record before us. Dr. Wadhwa's deposition was limited in this area by her counsel's advice not to answer certain questions.

Limiting objections were also made with regard to her knowledge that the abortion was not successful as certain of the fetal parts were not recovered. However, on one of

---

[2] Title 15, § 2901, et seq., Purdon's PA. STAT. ANN. (1970), is known as the Professional Corporation Law. Under § 2913(b), a "professional corporation shall be liable up to the full value of its property for any negligent or wrongful acts or misconduct committed by any of its officers, shareholders, employees or agents while they are engaged on behalf of the corporation in rendering professional services."

the medical records prepared by the doctor, this statement was made: "?? complete–fetal parts seen." Part of the plaintiff's malpractice contention was the doctor knew that the abortion was not totally successful but permitted the plaintiff to return to West Virginia without arranging for or advising her of the proper follow-up care—except to call Allegheny Center in Pittsburgh if she had problems. Whether there was a violation of the doctor's continuing duty of care, we believe, has some bearing on Infertility Services' exposure to personal jurisdiction in this State.

When the plaintiff returned to Fairmont, she developed cramps, vaginal bleeding and a fever. She went to the Fairmont General Hospital. Its personnel were apparently unsuccessful in diagnosing the exact nature of plaintiff's problem and released her. When her condition grew worse, she sought readmission at Fairmont General Hospital where she went into shock. She was then transferred to the West Virginia University Medical Center. Ultimately, personnel at the Medical Center were able to save her life. Before the undelivered fetal parts were removed, however, plaintiff developed acute renal failure arising from the septic abortion. Plaintiff, in the absence of a kidney transplant, now relies on ambulatory peritoneal dialysis as a life support system.

Plaintiff's attorney objected to the restrictions placed on Dr. Wadhwa's testimony at the deposition. He sought to resume the deposition and to obtain a ruling and sanctions before the circuit court stating that the defense objections were improper. However, the circuit court denied this motion and granted the defense attorney's motion to dismiss Infertility Services. We conclude for reasons hereinafter set out that this dismissal was error. We also conclude that plaintiff's attorney should be permitted to initiate further discovery as against Dr. Wadhwa and Infertility Services.

The central question is whether Infertility Services has sufficient contacts in this State to support personal jurisdiction under our Long-Arm Statute, W. Va. Code,

31-1-15.[3] We have traditionally recognized that our Long-Arm Statute must be read in light of the traditional due process requirements which we formulated in Syllabus Point 1 of *Hodge v. Sands Manufacturing Company*, 151 W. Va. 133, 150 S.E.2d 793 (1966):

> "The standard of jurisdictional due process is that a foreign corporation must have such minimum contacts with the state of the forum that the maintenance of an action in the forum does not offend traditional notions of fair play and substantial justice."[4]

*See also Chase v. Greyhound Lines, Inc.*, 158 W. Va. 382, 211 S.E.2d 273 (1975); *State ex rel. Coral Pools, Inc. v. Knapp*,

---

[3] The relevant portions of W. Va. Code, 31-1-15, are:

"Any foreign corporation which shall conduct affairs or do or transact business in this State without having been authorized so to do pursuant to the provisions of this article shall be conclusively presumed to have appointed the secretary of state as its attorney-in-fact with authority to accept service of notice and process on behalf of such corporation and upon whom service of notice and process may be made in this State for and upon every such corporation in any action or proceeding described in the next following paragraph of this section. . . .

"For the purpose of this section, a foreign corporation not authorized to conduct affairs or do or transact business in this State pursuant to the provisions of this article shall nevertheless be deemed to be conducting affairs or doing or transacting business herein (a) if such corporation makes a contract to be performed, in whole or in part, by any party thereto, in this State, (b) if such corporation commits a tort in whole or in part in this State, or (c) if such corporation manufactures, sells, offers for sale or supplies any product in a defective condition and such product causes injury to any person or property within this State notwithstanding the fact that such corporation had no agents, servants or employees or contacts within this State at the time of said injury."

[4] We believe that Syllabus Point 2 of *Schweppes U.S.A. Limited v. Kiger*, 158 W. Va. 794, 214 S.E.2d 867 (1975), is unduly restrictive in confining minimum contacts to the three enumerated categories contained in the preceding section of W. Va. Code, 31-1-15. *Schweppes* does not give effect to the first quoted paragraph of the statute nor to Syllabus Point 1 of *Hodge v. Sands Manufacturing Company, supra*. A summary of cases involving our Long-Arm Statute is found in: Note, *Civil Procedure–Jurisdiction–The West Virginia Long-Arm Statute*, 79 W. Va. L. Rev. 382 (1977).

147 W. Va. 704, 131 S.E.2d 81 (1963); *Gavenda Brothers, Inc. v. Elkins Limestone Company, Inc.*, 145 W. Va. 732, 116 S.E.2d 910 (1960).[5]

Our cases in this area are predicated upon the "minimum contacts" theory of doing business developed in *International Shoe Co. v. Washington*, 326 U.S. 310, 90 L.Ed. 95, 66 S.Ct. 154 (1945). Here, both parties rely on the recent case of *World-Wide Volkswagen Corporation v. Woodson*, 444 U.S. 286, 62 L.Ed.2d 490, 100 S.Ct. 559 (1980). In *World-Wide Volkswagen*, the Supreme Court, after affirming the validity of the minimum contact test concept, elaborated on factors to be considered in determining whether the minimum contact test has been met:

> "The relationship between the defendant and the forum must be such that it is 'reasonable ... to require the corporation to defend the particular suit which is brought there.' 326 US, at 317, 90 L Ed 95 [102], 66 S Ct 154 [158], 161 ALR 1057 [(1945)]. Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State's interest in adjudicating the dispute, see McGee v. International Life Ins. Co., 355 US 220, 223, 2 L Ed 2d 223 [226], 78 S Ct 199 [201] (1957); the plaintiff's interest in obtaining convenient and effective relief, see Kulko v. California Superior Court, supra, [436 U.S. 84, 56 L.Ed.2d 132, 98 S.Ct. 1690 (1978)] [436 U.S.] at 92, 56 L Ed 2d 132 [141], 98 S Ct 1690 [1697], at least when that interest is not adequately protected by the plaintiff's power to choose the forum, cf. Shaffer v. Heitner, 433 US 186, 211, n. 37, 53 L Ed 2d 683 [702], 97 S Ct 2569 [2583] (1977); the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive

---

[5] In *Brent v. Board of Trustees, Etc.*, 163 W. Va. 390, 256 S.E.2d 432 (1979), we applied the jurisdictional due process "doing business" test to our venue statute, W. Va. Code, 56-1-1(b), to determine whether a corporation was doing business in a particular county.

social policies, see Kulko v. California Superior Court, supra, [436 U.S.] at 93, 98, 56 L Ed 2d 132 [142, 145], 98 S Ct 1690 [1697, 1700]." 444 U.S. at 292, 62 L.Ed.2d at 498, 100 S.Ct. at 564.

In analyzing the present case, we begin with the contractual relationship between the plaintiff and Infertility Services. The contract contains two essential duties: the duty to use reasonable care in performing the abortion and, more importantly, the duty to provide appropriate follow-up care once it appeared likely that the abortion was not complete. *Lawson v. Conaway*, 37 W. Va. 159, 16 S.E. 569 (1892); 61 Am.Jur.2d *Physicians & Surgeons* §234 *et seq.* (1981); 70 C.J.S. *Physicians & Surgeons* §48 f (1951); Annot., 57 A.L.R.2d 379 (1958); Annot., 57 A.L.R.2d 432 (1958); Louisell and Williams, *Medical Malpractice* §8.08 (1977).

While we do not suggest that his professional duty required Infertility Services to follow the plaintiff into West Virginia in order to render on-going medical services, we do believe that it was required to arrange a competent source of treatment in West Virginia that could intelligently provide follow-up care in light of the probable unsuccessful abortion. To hold otherwise would emasculate the very heart of the professional obligation a doctor owes a patient. It was the failure to arrange for appropriate follow-up care which is claimed to have brought about the ultimate harm to the plaintiff in this State. When plaintiff visited the Fairmont General Hospital neither she nor the personnel at the hospital were aware that the abortion was incomplete. As a consequence, the hospital may well have been hampered in its diagnosis of her problem.

The interstate nature of this contractual relation presents the real dilemma to counsel for the injured plaintiff. The suit in West Virginia without Infertility Services as a party defendant enables Fairmont General Hospital to cast the entire responsibility for plaintiff's injuries on Infertility Services. On the other hand, if the plaintiff sues Infertility Services in Pittsburgh, she will not be able to join Fairmont General Hospital since it does no business in Pennsylvania. Consequently, Infertility Services could argue that the subsequent renal failure arising

from the septic abortion was a result of the misdiagnosis of the absent party in the Pittsburgh litigation—the Fairmont General Hospital—and, thereby, shift the major blame to it.

The defendant, Infertility Services, must be deemed to have a reasonable expectation that sending the plaintiff back into this State with an incomplete abortion and no satisfactory arrangements for follow-up care would result in severe damage to the plaintiff. This reasoning comports with another factor of the minimum contacts test discussed in *World-Wide Volkswagen, supra*, "that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." 444 U.S. at 297, 62 L.Ed.2d at 501, 100 S.Ct. at 567.

Moreover, we do not discount the fact that plaintiff may, through additional discovery, buttress her claim that Infertility Services either expressly or impliedly was aware that the Pittsburgh abortion clinic, Allegheny Center, was directly engaged in soliciting abortions in West Virginia from which Infertility Services was obtaining medical business and revenues.

We are aware of a number of medical malpractice cases where courts have refused resident plaintiffs the right to sue nonresident physicians or medical care facilities. In these cases, however, the plaintiffs only contended that the malpractice was a continuing tort giving rise to claims in the residential state. In these cases, no claims were made for a breach of the continuing duty of a physician to treat or arrange competent after care for the patient. Also no claims were made that the physicians or medical facilities were advertising or soliciting services in the plaintiffs' states. *E.g., Wright v. Yackley*, 459 F.2d 287 (9th Cir. 1972); *Chancelor v. Lawrence*, 501 F.Supp. 997 (N.D. Ill. 1980); *Glover v. Wagner*, 462 F.Supp. 308 (D. Neb. 1978); *Kurtz v. Draur*, 434 F.Supp. 958 (E.D. Pa. 1977); *Soares v. Roberts*, 417 F.Supp. 304 (D. R.I. 1976); *Markham v. Gray*, 393 F.Supp. 163 (W.D. N.Y. 1975); *Gelineau v. New York University Hospital*, 375 F.Supp. 661 (D. N.J. 1974); *McAndrew v. Burnett*, 374 F.Supp. 460 (M.D. Pa. 1974); *Kailieha v. Hayes*, 56 Haw. 306, 536 P.2d 568 (1975);

*Woodward v. Keenan,* 88 Mich. App. 791, 279 N.W.2d 317 (1979); *State ex rel. Sperandio v. Clymer,* 581 S.W.2d 377 (Mo. 1979); *Tarango v. Pastrana,* 94 N.M. 727, 616 P.2d 440 (1980). In *Woodward v. Keenan,* on the intermediate appeal, 79 Mich. App. 543, 549, 261 N.W.2d 80, 83 (1977), the court stated:

> "If, with the advent of advertising by professionals ... Michigan residents are encouraged on a systematic or continuing basis to utilize professional facilities outside of Michigan, then those offering this encouragement will have purposefully availed themselves of the privilege of conducting activities within Michigan and thereby have become amenable to the personal jurisdiction of our courts." (Footnote omitted)

Both *Wright v. Yackley, supra,* and *Soares v. Roberts, supra,* contain language recognizing that solicitation in the forum state by an out-of-state health care facility may be sufficient to provide minimum contacts to assert personal jurisdiction.

Many of the factors that we have previously recited from *World-Wide Volkswagen, supra,* were taken from *Kulko v. California Superior Court,* 436 U.S. 84, 56 L.Ed.2d 132, 98 S.Ct. 1690 (1978), in which a New York domiciled husband was found not to be liable to *in personam* jurisdiction in California. The parties' divorce occurred while they lived in New York. Under the terms of the divorce agreement, custody of the two children remained with the father during the school year but they would spend specified vacation periods with the mother during which time he was required to pay her child support.

The mother moved to California and subsequently the daughter advised the father that she desired to remain with her mother. The father consented. Two years later, the son took up residency with the mother who had sent the son plane fare without the father's knowledge. With both children in California, the mother sought to change custody and increase child support. The Court in *Kulko* concluded that the father's voluntary act in permitting his

daughter to return to California did not confer jurisdiction over him by the California courts:

> "There is no claim that appellant has visited physical injury on either property or persons within the State of California. Compare Hess v Pawloski, 274 US 352, 71 L Ed 1091, 47 S Ct 632 (1927). The cause of action herein asserted arises, not from the defendant's commercial transactions in interstate commerce, but rather from his personal, domestic relations. It thus cannot be said that appellant has sought a commercial benefit from solicitation of business from a resident of California that could reasonably render him liable to suit in state court; ..." 436 U.S. at 96-97, 56 L.Ed.2d at 144, 98 S.Ct. at 1699.

In the present case, the claim is not nearly so attenuated. Infertility Services, from the facts developed so far, appears to have breached its duty to arrange competent follow-up care to the plaintiff in West Virginia causing substantially increased injury to her in this State. Moreover, Infertility Services derives a direct economic benefit from the solicitation made by the abortion clinic, Allegheny Center, in Pittsburgh, for abortion business from West Virginia.

Under *World-Wide Volkswagen*, we also take into account "the plaintiff's interest in obtaining convenient and effective relief ... at least when that interest is not adequately protected by the plaintiff's power to choose the forum." 444 U.S. at 292, 62 L.Ed.2d at 498, 100 S.Ct. at 564. Here, by the nature of the injury done to the plaintiff by the incomplete abortion performed in Pittsburgh, compounded by the lack of adequate follow-up care by Infertility Services, and culminating in the misdiagnosis at Fairmont General Hospital, here is no one adequate forum that plaintiff can choose to resolve her wrongs against all of the parties in one lawsuit. It would seem manifestly unfair to the plaintiff to require her to bring a separate suit in Pittsburgh against Infertility Services, thereby enabling Infertility Services to cast the entire liability on the absent

defendant, Fairmont General Hospital.[6]

We also believe, under *World-Wide Volkswagen*, that this State has the primary interest in the efficient resolution of the controversy since the plaintiff is a resident of this State. The involvement of the co-defendant, Fairmont General Hospital, in the litigation rests in part upon the alleged malpractice authored by Infertility Services.[7] As a consequence, Fairmont General Hospital should be entitled to have its joint liability resolved with that of Infertility Services.

For the foregoing reasons, we conclude that the circuit court erred in dismissing Infertility Services. The plaintiff should be entitled to pursue additional discovery against Infertility Services to develop its involvement and knowledge, express or implied, with the solicitation of abortions by Allegheny Center in this State and such other facts that may bear on its contracts with this State. For purposes of the certified question, we conclude that

---

[6] While not explicitly stated in *World-Wide Volkswagen* or *Kulko*, we believe that one of the factors utilized in assessing the defendant's burdens in litigating in a distant or inconvenient forum is the geographic distance involved and the accessability to sources of proof. Here, substantially all of the plaintiff's damage proof and evidence of malpractice are centered in this State. The correct diagnosis of her medical condition and the entire recovery and rehabilitative evidence are centered at the West Virginia University Medical Center, which evidence may be difficult to produce at a Pittsburgh trial. The distance between Fairmont and Pittsburgh is approximately 100 miles. This distance would not impose too severe a travel burden on defendant Infertility Services, particularly when viewed with the geographic distance within the confines of the State of Pennsylvania that Infertility Services would be subjected to travel if it were sued in Philadelphia.

[7] Because the issue in this case arises on a certified question based on a motion to dismiss, we have construed plaintiff's factual allegations in the light most favorable to her. Syllabus Point 2, *Leasetronics v. Charleston Area Medical Center*, 165 W. Va. 773, 271 S.E.2d 608 (1980). In so doing, we do not intend to express a view as to the defendant's ultimate liability on the malpractice issues. *See Harrison v. Seltzer*, 165 W. Va. 366, 268 S.E.2d 312, 315 (1980).

sufficient facts relative to minimum contacts are developed to foreclose a dismissal of Infertility Services, Inc.

*Ruling on certified question reversed.*