HEALTH RELATED SERVICES, INC., Appellant,

v.

GOLDEN PLAINS CONVALESCENT CENTER, INC., Respondent.

No. WD 36242.

Missouri Court of Appeals, Western District.

Dec. 10, 1985.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Jan. 28, 1986.

Application to Transfer Denied March 25, 1986.

Duane J. Fox and Paul G. Schepers, Burrell, Seigfreid & Bingham, Kansas City, for appellant.

Benjamin F. Mann and Carol R. Gilham, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, for respondent.

Before LOWENSTEIN, P.J., and SHANGLER and SOMERVILLE, JJ.

SHANGLER, Judge.

The subject matter of suit is the breach of a management contract between Health Related Services, Inc. [HRS], a Missouri corporation, and Golden Plains Convalescent Center, Inc. [Golden Plains], a Kansas Corporation. The petition invoked personal jurisdiction over the person of the nonresident defendant by service of Golden Plains outside the state of Missouri under § 506.-510, RSMo Cum.Supp.1985. The petition alleged that the nonresident defendant Golden Plains submitted itself to the jurisdiction of the Missouri courts by the transaction of business with the plaintiff HRS in Missouri, within the meaning of § 506.500.-1(1), RSMo Cum.Supp.1985.[1] Service of process issued under § 506.510 and the nonresident defendant was duly served. The defendant Golden Plains moved to quash service and to dismiss the action. The court deemed the motion proven through the exhibits and affidavits submitted by the principals, and entered an order to quash the service of process upon the defendant and to dismiss the petition.[2]

The principals, HRS and Golden Plains concluded a contract on April 21, 1976 whereby HRS agreed to operate and manage Golden Plains, a skilled nursing home in Hutchinson, Kansas. The term of contract was for ten years subject to extension for two additional ten-year terms at the option of either signatory. The negotiations for contract were conducted at the Golden Plains site in Kansas, and at the time of contract HRS, although a Missouri corporation, maintained its office in Prairie Village, Kansas. On March 1, 1982, HRS removed its offices across the state line to Kansas City, Missouri. A form notice that the move impended was mailed on February 15, 1982 to Golden Plains [and apparently to other clients]. The principals continued performance under the contract for some nine months until December of 1982 when Golden Plains refused further performance on the justification of a prior breach by HRS. These facts are not in dispute. The contract document was before the court as an exhibit. The actual performances made by the principals under those terms were also before the court— but in the form of affidavit and counteraffidavit, and not as testimony open for assessment by the trier of fact as to weight and credibility.

A motion to quash service of process upon a nonresident defendant in an action brought under § 506.500 raises a dual inquiry: (1) whether the acts of the defendant fall within one of the enumerations of the statute—here, whether the cause of action arose from the transaction by the nonresident corporation of any business within this state, and (2) whether those acts suffice as minimum contacts so that the exercise of judicial jurisdiction over the person of the nonresident does not offend due process of law. *State ex rel. Newport v. Wiesman,* 627 S.W.2d 874, 877[2] (Mo. banc 1982); *M & D Enterpris-*

1. § 506.500. *Actions in which outstate service is authorized—jurisdiction of Missouri courts applicable, when*
 1. Any person or firm, whether or not a citizen or resident of this state, or any corporation, who in person or through an agent does any of the acts enumerated in this section, thereby submits such person, firm, or corporation, and, if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of such acts:
 (1) The transaction of any business within this state.

2. The motion did not contend that the petition failed to state a cause of action, but only that the allegations were insufficient to invoke the jurisdiction of the court over the person of the nonresident defendant. The proper procedure was a motion to quash service of process, not to dismiss. *Moore v. Christian Fidelity Life Insurance Company,* 687 S.W.2d 210, 211[1], n 1., (Mo.App.1984). We treat the pleading and order of the court as a motion and a judgment to quash service of process. *State ex rel. Newport v. Wiesman,* 627 S.W.2d 874, 875, 876 (Mo. banc 1982).

*es, Inc. v. Fournie*, 600 S.W.2d 64, 68[2] (Mo.App.1980).

■ It is evident from the articulated grounds of judgment that the order to quash the service of process upon the nonresident Golden Plains adjudicates neither inquiry but rests on the rationale that, whatever the contacts between the nonresident and the plaintiff, they were induced by the unilateral HRS remove from Kansas to Missouri, and therefore [presumably] as a matter of fair play and substantial justice may not sustain jurisdiction to bind the nonresident person to a judgment in Missouri—however purposeful, or beneficial, or substantial the Golden Plains activity with the forum:

### ORDER

Defendant's motion to quash service of summons and to dismiss is hereby GRANTED. [T]he Court believes the most important factors dictating the application of R.S.Mo. Section 506.500 in this case are:

1. The parties were originally Kansas corporations and residents.[3]
2. The contract in question was negotiated and entered into Kansas in 1976.
3. The only contact with Missouri occurred when plaintiff unilaterally moved its office to Kansas City, Missouri in 1982.
4. The defendant Nursing Home is now and always has been located in Hutchinson, Kansas and defendant never had an office or facility located in Missouri.

"The foreseeability that is critical to due process ... is that *the defendant's conduct and connection with the forum State* are such that he should reasonably anticipate being haled into court there." [emphasis added] *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). It is the conduct of a defendant alone toward the forum state, and not of the plaintiff [as the judgment supposes], therefore, which bears on the fairness that a nonresident expect suit to lodge there, and that defense be required there. *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958), draws that principle:

The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but *it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State*, thus invoking the benefits and protections of its laws. [emphasis added]

■ The order of the trial court to dismiss the service of process foreshortens the *Hanson v. Denckla* analysis. It rules implicitly and properly that the unilateral movement by HRS from Kansas to Missouri, simpliciter, could not, as a matter of due process principle, induce the unwilled consent of the nonresident contractor Golden Plains to suit and judgment in Missouri. It rules explicitly and improperly, however, that the Golden Plains contacts with Missouri thereafter, however purposeful, continuous or beneficial, do not avail to justify subjection of such an actor to suit and judgment in that forum. The unilateral HRS initiative to conduct business in Missouri, therefore, can neither create adjudicative jurisdiction over the nonresident Golden Plains, nor preclude it. The power of a court to subject a nonresident to process and judgment exists, however, "where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State." [emphasis in the original], *Burger King Corporation v. Rudzewicz*, —— U.S. ——, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985); *State ex rel. Sperandio v. Clymer*,

---

**3.** The plaintiff HRS was at the time of contract a Missouri corporation registered in Kansas, and thereafter continued as a corporation chartered in Missouri. HRS was never a resident of Kansas, and that component of the finding is palpably in error.

581 S.W.2d 377, 381[1] (Mo. banc 1979). The judgment of the trial court to quash services of process, therefore, is error. It neglects to determine from the proofs presented [here, the affidavits of the principals and the contract document] the essential question of fact: the contacts and affiliations, if any, purposefully undertaken by Golden Plains within Missouri, and the ultimate question of law: whether the quality and nature of that activity renders it reasonable and fair to require Golden Plains to expect suit there, and so to submit to defense and judgment there. *State ex rel. Sperandio*, 581 S.W.2d at 381[1].

A motion to quash service of process for want of jurisdiction over the person of the defendant casts the burden on the plaintiff to prove the jurisdictional fact, prima facie. *Osage Homestead, Inc. v. Sutphin*, 657 S.W.2d 346, 350[1] (Mo.App. 1983). A defendant may pose the issue of lack of jurisdiction over the person either as a pleaded defense or as a preliminary motion. Rule 55.27. A court may determine the subject of the motion on the affidavits of the principals, but may direct to hear the issue on oral testimony or depositions. Rule 55.28. The use of the interrogatory practice to make interstitial proof on the issue is also sanctioned. *State ex rel. Deere and Company v. Pinnell*, 454 W.W.2d 889, 894[6, 7] (Mo. banc 1970). The determination of the jurisdictional issue is for the trial court "in the first instance." *Pinnell*, supra, at 893[4, 5]. The sufficiency of the evidence to dispel the objection of the motion and to prove, prima facie, that the exercise of jurisdiction over the person of the defendant does not offend traditional concepts of fair play and substantial justice, however, presents a matter of law—due process of law. *International Shoe Company v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1946); *Kulko v. California Superior Court*, 436 U.S. 84, 92, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132 (1978).

The evidence before the trial court on the issue of jurisdiction was the affidavit of Golden Plains chief executive officer, Kumba, with the contract and the HRS notice of removal to Missouri attached, and the affidavit of HRS president Schnaufer.

The management contract appended to the Kumba affidavit constitutes the agreement of Golden Plains that HRS manage the facility, and the agreement of HRS to undertake the management, for a term of ten years. That management entailed, among the other terms, the HRS duty

1. to supervise every departmental operation of the facility and to establish policies to be carried out by the Golden Plains personnel

2. to procure and recruit personnel for Golden Plains and to train and qualify them "on an initial and on-going basis"

3. to establish fiscal policies to be followed by the personnel, and to provide forms and systems "for all phases of the operation and training of personnel"

4. to establish rates for patient care and services and the uses of specialty equipment and facilities—"which schedule shall be followed by [Golden Plains] without deviation except upon approval by HRS"

5. to furnish a central bookkeeping system for the operation of the facility, to include a computerized payroll, these records to be open to Golden Plains examination at all reasonable times

6. to furnish Golden Plains a monthly profit and loss statement, year-end fiscal reports, the preparation by HRS for Golden Plains of an annual unaudited profit and loss statement and balance sheet

7. to purchase for Golden Plains "all supplies and equipment at the best price available"

8. to negotiate on behalf of Golden Plains "any accreditation and eligibility matters in regard to Federal, State and local programs of governmental cooperation or assistance"

9. to negotiate contracts with patients, governmental agencies and institutions on behalf of Golden Plains

10. to establish bank accounts for Golden Plains and to "sign all checks in connection with the operation and payroll of said facility"

11. "to hire and discharge any and all personnel in accordance with its best judgment"

The Golden Plains affidavit incorporates the management contract terms by reference. The affidavit recites the identity and capacity of the signatory affiant, acknowledges the execution of the management contract with HRS, avers that the document was prepared by HRS, negotiated in Kansas, and executed in Kansas. The affidavit recites also that at the time of execution of agreement [April 21, 1976] HRS had its offices in Prairie Village, Kansas and that the offices were moved into Missouri on March 1, 1982. The affidavit concludes with the affirmation: "That Golden Plains Convalescent Center, Inc. does not now and has not conducted any business at the offices of Health Related Services, Inc. in the State of Missouri. That the only contact between Golden Plains Convalescent Center, Inc. and Health Related Services, Inc. outside of the skilled nursing home in Hutchinson, Kansas, was for the purpose of furnishing information to Health Related Services, Inc. to carry out the terms of the management contract."

The affidavit of president Schnaufer on behalf of HRS, given to support the fairness of jurisdiction over Golden Plains in the Missouri court, recites the capacity of the signatory affiant, recites that on March 1, 1982, HRS moved its offices to 6400 Prospect in Kansas City, Missouri, and has conducted its business from that site since. The affidavit recites further that since that date of removal to Missouri until Golden Plains refused to perform further under the contract [December 17, 1982, as the petition pleads], HRS "performed its duties under that management contract from its offices in Missouri." The affidavit then gives this detail of the HRS performance in Missouri under the contract for the period from March 1, 1982 until December 17, 1982:

1. The activities performed by HRSI in Missouri on behalf of Golden Plains included supervision of the operation of the nursing home, paying all Golden Plains bills relative to operations, preparation of monthly profit and loss statements, ordering materials and supplies for the nursing home operation, preparation and maintainance [sic] of the books and records of the nursing home operation, preparation of payroll for all nursing home employees, completing all licensing forms and submitting same to the appropriate agency, providing insurance coverage for the facility and operations, preparing and submitted [sic] Medicaid and Medicare Cost Reports, preparation and submission of employment, payroll and FICA tax reports, supplying all forms used for the operation of the nursing home (nurses' progress note forms, medication forms, etc.), maintaining and updating patient care manuals used by the nursing home personnel in accordance with government regulations, reviewing governmental agency deficiency reports and preparing recommendations on how to resolve deficiencies and generally supervising the operation of the Golden Plains Nursing Home.

2. On an almost daily basis someone at Plaintiff's offices in Missouri spoke with Defendant's nursing home administrator or other of Defendant's employees in Hutchinson, Kansas for the purpose of managing the affairs of the Golden Plains nursing home, which personnel at the nursing home are "employees of THE OWNER (Golden Plains) for all purposes" under paragraph 4(B) of the management contract. In consideration of the services performed by HRSI under the management contract, Golden Plains mailed monthly payment to the offices of HRSI equal to 5% of the gross revenues received until December, 1982, when Golden Plains unilaterally terminated the management contract.

3. In December of 1982 Marilyn Luman, the nursing home administrator at Golden Plains, spent two days at the offices of HRSI in Missouri at a training session conducted by HRSI.

4. After June 30, 1982, which coincides with Golden Plains Care Center, Inc.'s fiscal year-end, Mr. Steve Selzer, an accountant employed by Golden Plains, spent approximately one week at the offices of HRSI in Missouri reviewing and auditing the books of Golden Plains maintained at the offices of HRSI.

5. In November of 1982 Steve Selzer, on behalf of Golden Plains, spent at least a day at the offices of HRSI in Missouri collecting books and records of Golden Plains, maintained at the offices of HRSI, to take them to Hutchinson, Kansas.

The affidavits of Golden Plains and HRS do not contradict as to the number and kind of contacts between Golden Plains and the Missouri forum during the last nine months of the performed contract. They are as delineated in the acknowledgments and recitals of the principals and in the contract terms to which the affidavits refer. The Golden Plains affidavit acknowledges contacts with the Missouri forum during this period "for the purpose of furnishing information to Health Services, Inc. which [were] necessary to enable Health Related Services, Inc. to carry out the terms of the management contract." [4] The contacts Golden Plains concedes, therefore, are those the performance of the contract imposes upon the principals. That regimen, acknowledged in the Golden Plains affidavit but undefined, is rendered in compatible detail in the HRS affidavit: HRS from the Missouri office planned and supervised the Golden Plains operation —HRS engaged the personnel, set the salary, trained them

on a continuous basis [Golden Plains Administrator Luman was trained for two days at the HRS office in Missouri in the interim], and discharged them at discretion; HRS established all policy, set the patient rates, supervised their diets, negotiated patient contracts, kept the books, made up the payroll, signed the checks, obtained the insurance, purchased the supplies and equipment, furnished monthly financial statement and periodic audits to Golden Plains, devised forms and systems for every phase of the facility operation—in short, directed and controlled the Golden Plains enterprise. In return, Golden Plains remitted to the HRS office in Missouri a sum equal to five percent of the gross revenues, but not less than $750, each month.

These averments of fact as to the manifold activity under the contract between nonresident Golden Plains in Kansas and the HRS office in Missouri are all uncontested and undenied and hence are deemed admitted as they may bear on the prima facie proof of the jurisdictional fact—and the avoidance of the motion to quash. *Data Disc, Inc. v. Systems Technology Associates,* 557 F.2d 1280, 1284 et seq. (9th Cir.1977); 60 C.J.S., Motions & Orders § 34(a); *and see Commercial Lithographing Co. v. Family Media, Inc.,* 695 S.W.2d 936 (Mo.App.1985). The quantum of nonresident conduct alone, however, does not render the foreign state a fair forum. The quantum and *quality* of the activity in the state of suit is the essential determinant as to whether it is fair to require defense there. *Kulko v. Superior Court of California,* 436 U.S. 84, 92, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132 (1978). "It is essential in each case that there be *some act by which the defendant purposefully*

4. The Golden Plains affidavit includes the peremptory declaration, also: "That Golden Plains Convalescent Center, Inc. does not now and has not conducted any business at the offices of Health Related Services, Inc. in the State of Missouri." That affirmation, of course, is a conclusion. The determination of the *transaction of business in Missouri* —a mixed question of fact and law—bears primarily on whether or

not the acts of the defendant fall within one of the enumerations of § 506.500, and hence subjects the nonresident to adjudication under the statute—[one of the inquiries a motion to quash service of process for want of jurisdiction over the person of the nonresident raises]. *State ex rel. Newport v. Wiesman,* 627 S.W.2d 874, 877[2] (Mo. banc 1982).

*avails itself of the privilege of conducting activities within the forum State,* thus invoking the benefits and protections of its laws." [emphasis added] *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). Thus, random, fortuitous or attenuated contacts by the nonresident with the forum, or the unilateral activity of 'another party do not suffice to induce the nonresident to a reasonable anticipation of liability to suit there. *World-wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 299, 100 S.Ct. 559, 568, 62 L.Ed.2d 490 (1980). Jurisdiction *is* proper, however, where the contacts directly result from actions of the defendant itself that create a "substantial connection" with the forum state. *McGee v. International Life Insurance Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957).

Golden Plains argues that the telephone and letter communications with the HRS site in Missouri [the affidavits describe and the contract presupposes] cannot amount to that purposeful availment of the forum state which alone suffices for due process exercise of jurisdiction over the nonresident because at the time the contract was executed the principals were both located in Kansas and there was no reasonable basis for Golden Plains to anticipate that performance of the contract terms would risk litigation in Missouri. That is merely to reargue that the Golden Plains performance of the contract in Missouri was compelled by the unilateral HRS remove from Kansas, and hence amounted to contact too fortuitous to satisfy a due process exercise of nonresident jurisdiction. That is also to slight once again the cognate fundament that, the unilateral initiatives of HRS notwithstanding, a nonresident who purposefully acts to form a substantial connection with the forum state may expect as a matter of fairness to respond in the courts of that state. That is especially so where the cause in suit arises from that act or transaction. *McGee v. International Life Insurance Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957); *State ex rel. Caine v. Richardson,* 600 S.W.2d 82, 84[2, 3] (Mo.App.1980). Nor does the fact of an only occasional physical presence of the nonresident in the forum state [here through Golden Plains employee Luman and retainer Selzer]—as argument supposes—attenuate the propriety of the subjection to judgment of a nonresident who has otherwise deliberately carried on significant activity within the state of suit.

The contentions Golden Plains poses are given essential answer in *Burger King Corporation v. Rudzewicz,* ── U.S. ──, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985). In that case, Rudzewicz and another, Michigan residents, applied for and were granted a franchise to operate a Burger King outlet. The franchise agreement issued from the Burger King headquarters in Miami, Florida, and was supervised from both the district office in Michigan and the headquarters in Miami. The franchise agreement was for a term of twenty years. The agreement terms were for Burger King to allow the franchisee use of its trademarks, to furnish assistance in advertisement, to train personnel, to give guidance in accounting, inventory-control and fiscal procedures, among other provisions. In exchange, the franchisees paid Burger King an initial fee and agreed to pay a monthly royalty to Miami on gross sales. The franchisees [in the words of the opinion] "also agree[d] to submit to the national organization's exacting regulation of virtually every conceivable aspect of their operations." 105 S.Ct. at 2178. The headquarters in Miami set the policy and worked directly with the franchisees to resolve major problems. The franchisees fell behind in the payments to Miami and headquarters sent notices of default. Headquarters then terminated the franchise and ordered the premises vacated, but the franchisees refused. Burger King commenced suit in the Florida federal court under the state long-arm statute for a breach of contract in Florida by failure of the defendants [franchisees] to perform acts required by the contract to be performed in Florida. The petition alleged, as required by the Florida statute, that the cause of action arose from the breach of contract. The franchisees

[defendants] contested jurisdiction over their persons on the grounds that the cause of action did not arise in Florida and that the court was otherwise without power to render a judgment against them as nonresidents of Florida.

The United States Supreme Court commenced analysis with the obtaining principle of *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945): "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.' " *Burger King,* 105 S.Ct. at 2181, 82. The court continued rejection of a mechanistic quantum of contacts test to derive jurisdictional fact. It rejected as well the concomitant that, for purposes of due process analysis, a contract with a nonresident *alone* and *ipso facto* suffices as a minimum contact with the home forum to enable jurisdiction over the nonresident contractor. The court adopted, rather, [*Burger King,* 105 S.Ct. at 2185, 86]:

> a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.' [*Hoopeston Canning Co. v. Cullen,* 318 U.S. 313, 316, 63 S.Ct. 602, 604, 87 L.Ed. 777 (1943)]. *It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.* [emphasis added]

In the course of opinion, the court dealt with the contentions Golden Plains also poses: that the quality of the nonresident contacts with the forum state were only fortuitous, random and attenuated because there was only the barest incidence of physical presence there and that the basic interrelation between the contractors was by mail and telephone [105 S.Ct. at 2184]:

> Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there. [Citations omitted. Emphasis in original]

The court then applied these principles to the proof

[105 S.Ct. at 2186]:

> In this case, no physical ties to Florida can be attributed to Rudzewicz other than [co-franchisee] MacShara's brief training course in Miami. Rudzewicz did not maintain offices in Florida and, for all that appears from the record, has never even visited there. Yet this franchise dispute grew directly out of "a contract which had a *substantial* connection with that State." *McGee v. International Life Insurance Co.,* 355 U.S. at 223 [78 S.Ct. at 201] [emphasis in original]. Eschewing the option of operating an independent local enterprise, Rudzewicz deliberately "reach[ed] out beyond" Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization. [citation omitted] Upon approval, he entered into a carefully structured 20–year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida. In light of Rudzewicz's volun-

tary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters, the "quality and nature" of his relationship to the company in Florida can in no sense be viewed as "random," "fortuitous," or "attenuated." [citations omitted] Rudzewicz's refusal to make the contractually required payments in Miami, and his continued use of Burger King's trademarks and confidential business information after his termination, caused foreseeable injuries to the corporation in Florida. For these reasons it was, at the very least, presumptively reasonable for Rudzewicz to be called to account there for such injuries.

The opinion then treated the communications between the principals in the performance of such a contract as affiliating contacts with the forum state which enabled jurisdiction over the nonresident party [105 S.Ct. at 2186, 87]:

The contract documents themselves emphasize that Burger King's operations are conducted and supervised from the Miami headquarters, that all relevant notices and payments must be sent there, and that the agreements were made in and enforced from Miami.... Moreover, the parties' actual course of dealing repeatedly confirmed that decisionmaking authority was vested in the Miami headquarters ... Throughout these disputes, the Miami headquarters and the Michigan franchisees carried on a continuous course of direct communications by mail and by telephone, and it was the Miami headquarters that made the key negotiating decisions out of which the instant litigation arose.

The court concluded [105 S.Ct. at 2190]: Because Rudzewicz established a substantial and continuing relationship with Burger King's Miami headquarters, received fair notice from the contract documents and the course of dealing that he might be subject to suit in Florida, and has failed to demonstrate how jurisdiction in that forum, would otherwise be fundamentally unfair, we conclude that the District Court's exercise of jurisdiction [under the Florida statute] did not offend due process.

The parallel of fact and principle between *Burger King* and Golden Plains is cogent and unmistakable. In each case, the relationship is between an individual enterprise with a nationwide organization.[5] In each case, one of the express ends of contract was for the individual enterprise to have the benefit of the experience, supervisory acumen and management skill of the nationwide organization. In each case, the individual enterprise by contract term voluntarily accepted a long-term and exacting regulation of the business from the main office of the nationwide organization. In each case, the contract terms contemplated that the management function was to be exercised by communications and directives from the main office, and that the enterprise function was to be exercised by faithful compliance with the policy, advisements and decisions the communications from the main office conveyed. In each case, the physical presence of the individual enterpriser at the nationwide organization site was not essential to the performance of the contract, and in each case, there was in fact such a presence—on one occasion—for the employee training the contract terms contemplated. [In the case of Golden Plains, moreover, the books, records and the bank paraphernalia were physically sited at the HRS office.] In each case, the essential individual enterprise perform-

**5.** The preamble to the Management Contract between Golden Plains [there designated THE OWNER] and HRS recites:

WHEREAS, HRS., INC., is a corporation engaged in the business of building, operating and managing extended care facilities and nursing homes in various locations in the United States, and

WHEREAS, THE OWNER is in the process of planning and construction of a nursing home in HUTCHINSON, KANSAS, hereinafter called THE HOME, and desires to secure the experience, supervision and services of HRS, INC., in connection with the management and operation of said facility, and HRS., INC. has indicated a willingness and desire to so manage and operate said HOME ...

ance—the payment of the monthly royalty—was by remittance to the main office of the nationwide organization.

The parallel of fact is not altogether congruent, since the contract documents in *Burger King* provide that the supervision of the Michigan franchise was from the headquarters office in Miami, that the payments were for remittance there, and that the agreement was to be governed and construed in accordance with the laws of Florida. That is, that the franchisee in *Burger King* knew at outset that the contract affiliation was with a business in Florida, and hence had fair notice "from the contract documents and the course of dealing that he might be subject to suit in Florida." 105 S.Ct. at 2190. Golden Plains, on the other hand, did not know *at outset* of contract that HRS would leave Kansas for Missouri across the common state line. The contract between them was negotiated in Kansas and signed in Kansas. Golden Plains did know that HRS was a Missouri corporation engaged in the business of construction and management of nursing home facilities such as the Golden Plains convalescent center in locations throughout the United States. It knew, therefore, that the HRS corporate activity was not confined to Kansas, even though the main office was sited there at the execution of the management contract. That plain reality may have prompted the ready Golden Plains acquiescence from March 1, 1982 to continue performance with Missouri and to accept performance from HRS in Missouri. That willing assent to the new mode of performance, as our discussion determines, renders it fair as a matter of contract law to treat the management agreement after March 1, 1982 as an undertaking between out-of-state contractors, and, as a matter of due process, to treat the performance in Missouri of the contract obligations by the Kansas signatory as contacts which amount to the purposeful availment of the protection by the nonresident of the Missouri forum.

As a matter of contract principle, there is no basis to conclude—nor does Golden Plains suggest—that any inherent unfairness resulted during the last nine months from the HRS performance from a contiguous Missouri site rather than from Kansas, or from the reciprocal obligation of Golden Plains to perform there. The management by HRS the contract contemplates is a performance predominantly by mail and telephone, and the Golden Plains reciprocal performance calls for no more [as in *Burger King*]. HRS devised the fiscal, personnel and operational systems and procedures, and Golden Plains put them into effect and remitted payment each month by mail. The day-to-day problems of management were resolved by telephone between the principals. The notices required under the contract were given by mail to the HRS office [as in *Burger King*]. The prerogative of Golden Plains to train personnel at the HRS office site was exercised only once [as in *Burger King*] during the last nine months, and then only for two days. There is no suggestion that to train an employee in Kansas City, Missouri, rather than in Prairie Village, Kansas, cities both contiguous and with nearby city centers, imposed any hardship on Golden Plains. There is no intimation in the contract terms that an HRS site outside of Kansas would impair the ability of Golden Plains to function as a convalescent home, or even cause the facility an inconvenience and from the record before us, the change of site to Missouri incurred no such complaint. We are led to conclude that although the contract terms do not allude to Missouri for performance, the discharge of the HRS management function from the corporation office in a state other than Kansas was not beyond the spirit of the contract.

 If we assume that the reciprocal performances were expected and confined to within Kansas at the time the document was executed [a term the contract does not express], the HRS notice to Golden Plains on February 15, 1982, that on March 1, 1982, HRS would commence its consolidated management operation from Kansas City, Missouri—with the added direction that all notices be addressed there there-

after—and the Golden Plains acquiescence to that change of contract term amounted to extinguishment of the prior term and a novation. A novation is a substitution of a new contract obligation for an old one. *Moley v. Plaza Properties, Inc.,* 549 S.W.2d 633, 635[2] (Mo.App.1977). It occurs by the intention of the parties and the assent for novation and acceptance of a new obligation for the old may be shown from the attendant circumstances and the conduct of the parties thereafter. *W. Crawford Smith, Inc. v. Watkins,* 425 S.W.2d 276, 278[3–6] (Mo.App.1968). The HRS initiative to move to Missouri [and the concomitant overture to Golden Plains to make performance there] was accepted by Golden Plains without objection and continued until the facility ceased performance nine months later. There is no intimation or contention that the Golden Plains performance was under duress or was otherwise unfair as a matter of due process so as to render the expectation and risk of suit in Missouri for that activity unfair. *See Burger King,* supra, 105 S.Ct. 2184. Golden Plains, rather, gave a ready, self-willed and continuous assent to the new condition for performance in Missouri. It was for all purposes an operative term of contract between the parties from March 1, 1982 until performance ceased altogether nine months later. Whatever expectation the original contract may have implied that the reciprocal performances be confined to within Kansas was, as a matter of principle, extinguished by the new expectation that from March 1, 1982 the obligations of the contract involved performance in Missouri.

The question remains whether the terms of contract and the actual course of dealing between HRS and Golden Plains *after* the March 1, 1982 move to Missouri sufficed as minimum contacts to enable that forum to subject Golden Plains to process and judgment and to constitute fair notice to the nonresident of that risk. The question,

restated in the *Burger King* formulation [105 S.Ct. at 2190]: whether Golden Plains established a substantial and continuing relationship with [the HRS Missouri office], received fair notice from the contract documents and the course of dealing that [Golden Plains] might be subject to suit in [Missouri].

The contract documents after March 1, 1982, as we conclude, by the continued assent and conformed practice to expect and to give performance with Missouri was as between a Missouri signatory and a Kansas signatory and involved ties with Missouri.

The terms as written [and as in *Burger King*] were a "carefully structured [long-term][6] relationship that envisioned continuing and wide-reaching contacts with [HRS]" [*Burger King,* supra, 105 S.Ct. at 2186], and from March 1, 1982, envisioned those contacts in Missouri. The actual course of dealing under the contract was for the HRS management over every phase of the Golden Plains operation in Kansas from the HRS office in Missouri. It was a supervision even more pervasive than the activity between the franchisor and cofranchisees the court in *Burger King* determined sufficient to subject the nonresident to judgment in Florida. The management contract subjected Golden Plains to the fiscal, personnel, policy, logistical and such other HRS supervision, but in addition encompassed the power to contract for the facility, the power to hire and fire personnel at discretion and to keep and maintain at the Missouri office site the books, records and bank paraphernalia of Golden Plains, and to issue payment. The actual course of dealing under the conformed practices amounted to that "voluntary acceptance [by Golden Plains] of the long-term and exacting regulation of [its] business" from Missouri the court in *Burger King,* 105 S.Ct. at 2186, found a sufficiently purposeful nexus with the forum state to enable suit and judgment there against the

---

**6.** The management contract was for a term of ten years with the option of either party to extend the term for two successive ten years.

At the time performance ceased, some four years of the original term remained.

nonresident. Golden Plains accepted the terms of a contract which subjected its Kansas operations to the exacting regulation of HRS, first from within Kansas and then from Missouri. That reciprocal performance entailed faithful Kansas response to the directions and decisions made in Missouri, and the continuous intercommunications between the contractors [as the affidavits disclose] was the lifeline. Golden Plains was fed from Missouri [HRS purchased all supplies and supervised the preparation of the food and the dietary regimen], directed every aspect of the internal management of the facility, kept and maintained the business books and controlled and paid the Kansas personnel—all [after March 1, 1982] from Missouri. For these services, Golden Plains remitted to HRS in Missouri.

■ It was foreseeable to Golden Plains that the refusal to continue the transaction of business under the contract terms would cause injury to HRS in Missouri. It was therefore reasonable "for [Golden Plains] to be called to account there for such injuries." *Burger King*, 105 S.Ct. at 2186. The contract established a substantial and continuous relationship between Golden Plains and HRS. The voluntary Golden Plains assent to the HRS performance of the contract from Missouri after March 1, 1982, and the reciprocal, self-willed course of dealing with Missouri under the contract thereafter amounted to a purposeful availment of the benefits and protections of the Missouri laws [*Hanson v. Denkla*, 357 U.S. at 253, 78 S.Ct. at 1239], and were such that Golden Plains "should reasonably anticipate being haled into court there" [*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490].

The motion to quash service of process for want of jurisdiction poses another question: whether the acts of the defendant fall within one of the enumerations of the statute—here, whether the cause of action arose from the transaction by the nonresident of any business within this state. The petition pleads the contract, the perform-ance of its terms by the principals, that Golden Plains transacted business with HRS in Missouri on a continuous and regular basis in the performance of the contract, the refusal by Golden Plains on December 17, 1982, to perform further, and the refusal to pay HRS the management fee provided by the contract. This pleads, prima facie, that the cause of action arose from the transaction of the contract between the principals, and there is no contention to the contrary.

The question is whether the performance of the contract constituted "the transaction of any business within [Missouri] under § 506.500.1(1). Our decisions accord to "the transaction of any business within this state" term—where the cause of action derives directly from that activity—a broad meaning "so as not to deny jurisdiction under § 506.500 in situations in which the due process clause would permit the assertion of personal jurisdiction." *State ex rel. Newport v. Wiesman*, 627 S.W.2d 874, 876 (Mo. banc 1982); *State ex rel. Metal Service Center of Georgia, Inc. v. Gaertner*, 677 S.W.2d 325 (Mo. banc 1984); *State ex rel. Deere & Co. v. Pinnell*, 454 S.W.2d 889, 892 (Mo. banc 1970). We have determined that no impediment of due process principle prevents the exercise of Missouri jurisdiction over the person of nonresident Golden Plains. A parity of reason requires our further determination that the activity between HRS and Golden Plains under the contract from March 1, 1982, constituted the transaction of business in Missouri. Our decisions find that there was both sufficient contact with Missouri to enable jurisdiction over the person of the nonresident as a matter of due process of law—as well as the "transaction of business" under § 506.500.1(1)—where each one of eight conferences with the nonresident in Missouri contributed to the eventual contract [*State ex rel. Farmland Industries, Inc. v. Elliott*, 560 S.W.2d 60 (Mo.App.1977) ] and where meetings conducted with the nonresident in Missouri culminated in an option agreement executed in Illinois [*State ex rel. Peoples Bank of Bloomington v. Stussie*, 536 S.W.2d 934 (Mo.App.1976) ], among

others. The incident of transaction under the subsistent contract between nonresident Golden Plains and HRS in Missouri, was from March 1, 1982, a continuous, uninterrupted and sustained course of conduct. It exceeds the quantum of activity our decisions deem sufficient to establish prima facie that the nonresident transacted business in Missouri for purposes of adjudication under § 506.500.1(1).

The judgment of dismissal is set aside, and the cause is remanded with directions to reinstate the petition.

SOMERVILLE, J., concurs.

LOWENSTEIN, P.J., dissents in separate dissenting opinion filed.

LOWENSTEIN, Judge, dissenting.

I respectfully dissent.

For Missouri courts to exercise personal jurisdiction over a non-resident defendant, the defendant's acts must fall within one of the categories of the "long-arm" statute and must constitute sufficient contacts with Missouri so that exercise of jurisdiction by our courts satisfies due process requirements. *Medicine Shoppe International, Inc. v. J–Pral Corp.*, 662 S.W.2d 263, 271 (Mo.App.1983).

The United States Supreme Court in its landmark decision, *International Shoe Company v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), created the "minimum contacts" requirement with the forum state. The court stated that due process is met and personal jurisdiction is established only if the contacts make it "reasonable and just according to our traditional conception of Fair play." *Id.* at 320, 66 S.Ct. at 160. The subsequent case of *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958), quoted by the majority, is now repeated with different emphasis:

> The *unilateral activity* of those who claim some relationship with a nonresident defendant *cannot satisfy* the requirement of contract with the forum state. The application of that rule will vary with the quality and nature of the

defendant's activity, but it is essential in each case that there be some act by which the defendant *purposefully avails* itself of the privilege of conducting activities within the forum state, thus involving the benefits and protections of its laws. (Emphasis added.)

The minimum contacts requirement was discussed in the context of Missouri law in *Breiner Equipment Co. v. Dynaquip, Inc.*, 539 F.Supp. 204, 206 (E.D.Mo.1982), where the court found the contacts insufficient to exercise personal jurisdiction. The court held "[n]either use of the mails, telephone calls, nor unilateral activities on the part of the plaintiff in performing a contract is enough to subject a defendant to service of process in Missouri."

In the present case Golden Plains did not initiate, encourage, or receive economic benefit from HRS's unilateral move into Missouri. For ten months after the move Golden Plains necessarily made telephone calls to the Missouri office, and mailed its payments to the new office but as the *Breiner* case holds, neither of these activities establish sufficient contact with the forum state. Likewise, HRS's activities in Missouri were strictly unilateral. The fact Golden Plains had to send an accountant in June, 1982 to the Missouri offices because that's where the books were located and sent an employee for a training session in December, 1982, does not establish minimum contacts. Golden Plains had no choice in the matter, and did not *purposefully* avail itself of the privilege of conducting activities in Missouri. *Hanson, supra,* 357 U.S. at 253, 78 S.Ct. at 1239. The "quality and nature" of Golden Plains' activity in Missouri resulting from the plaintiff's move do not rise to the level of "affiliating circumstances" to make it reasonable and fair to have to conduct a defense in Missouri. *Kulko v. Superior Court of California*, 436 U.S. 84, 92, 98 S.Ct. 1690, 1697, 56 L.Ed.2d 132 (1978). That Golden Plains continued contractual dealings with HRS after HRS moved to Missouri does not, under these circumstances, result in its being subjected to *in personam* jurisdic-

tion in this state. *Kulko, supra,* at 94, 98 S.Ct. at 1698. Also, it can be said the defendant here did not *purposefully* derive any benefit from any of the activities relating to Missouri. *State ex rel. Sperandio v. Clymer,* 581 S.W.2d 377, 382 (Mo. banc 1979). In *M & D Enterprises, Inc. v. Fournie,* 600 S.W.2d 64, 68 (Mo.App.1980), the court sets out five factors in considering the sufficiency of the minimum contracts for jurisdiction: (1) the nature and quality; (2) quantity; (3) relationship of the cause to the contacts; (4) the interest of Missouri in providing a forum; and (5) the convenience or inconvenience to the parties. Under these factors the contacts in Missouri, well after the contract, are insufficient to establish jurisdiction in this state, especially considering that this contract was, and continues to be for the management of a nursing home in *Kansas.*

The majority interprets *Hanson* and *Sperandio* as supporting the conclusion of the activities of Golden Plains as amounting to sufficient contacts or of being a substantial connection. In short, the defendant could not consider the contract breached by HRS's move. By its *reaction* of continuing to do business, as it was contractually obligated to do with HRS Golden Plains should not be subject to our court's jurisdiction.

The majority's determination of *Burger King's* facts being parallel to those here I believe is incorrect. In the case at bar a nursing home in Hutchinson, Kansas simply wanted *help* in running a business that presumably drew patients from the area. Unlike the franchisee in *Burger King,* it couldn't be imagined why Golden Plains would reach out to another state for management services to get some manifold benefits from a large nationwide organization. The franchisee in *Burger King* presumably could have opened his own hamburger stand. Had he done so and hired someone to come in and manage the operation, and that manager, a corporation, then moved its offices out of the area and a dispute developed, and the owner then been sued in another state would the facts in *Burger King* equate to those in this case.

Golden Plains wanted some help, but was not in the position of a fast foods franchisee who could have its store closed because it did not comply with operational decisions as made by HRS. The situation in this case is most dissimilar to the franchise relationship in *Burger King.*

The majority also contends it was foreseeable to Golden Plains that HRS would move to Missouri because it was a Missouri corporation. While that argument may sound compelling it ignores the undisputed fact HRS's move six years into a ten year contract was a *unilateral* action; no matter how foreseeable the action might be, it cannot create the contact necessary for personal jurisdiction.

Further, I cannot agree any novation occurred. There was no contractual provision as to the state in which any lawsuit might be litigated. It is inconceivable the "response" of Golden Plains to the move of corporate offices could add such provision to the contract.

The result in this case works both ways. Assume a retirement home located in a small town in a remote part of this state which contracts for management with a New York corporation that has its main office in Columbia, Missouri, that moves its operation to New York, and assuming New York has a similar long arm statute, the Missouri home must defend any action in New York courts. The Missouri home then could not bleat about the New York contacts since the management firm had taken all the home's books and reports of the home from Columbia to New York, and, the home then had to go or call there to check on its own records. The import of such a result should cause counsel to include appropriate provisions in future contracts.

The trial court's judgment dismissing the case and quashing service should be affirmed.