BLANCHE ETRA et al., as Executors of HARRY ETRA, Deceased, Plaintiffs, v RAYMOND MATTA et al., Defendants.

RAYMOND MATTA, Third-Party Plaintiff-Respondent, v BERNARD LOWN, Third-Party Defendant-Appellant.

First Department, July 14, 1983

### APPEARANCES OF COUNSEL

*Steven J. Ahmuty, Jr.,* of counsel (*Bower & Gardner,* attorneys), for third-party defendant-appellant.

*Frederick N. Gaffney* of counsel (*Ann R. Goodwin* with him on the brief; *Costello & Shea,* attorneys), for third-party plaintiff-respondent.

### OPINION OF THE COURT

CARRO, J.

This appeal presents the novel question of whether a nonresident physician who has never entered this State may be subject to New York jurisdiction on the theory that

his out-of-State medical treatment with an experimental drug on a patient, and the subsequent shipment by the physician to the New York patient of renewed supplies of that drug, coupled with telephonic and written communication with the patient's New York physician, constitutes either the contracting to supply goods or services in the State within the meaning of CPLR 302 (subd [a], par 1) or commission of a tortious act without the State causing injury to a person within the State where the physician should have reasonably expected his acts to have consequences in this State and he derived substantial revenue from interstate commerce, CPLR 302 (subd [a], par 3, cl [ii]). We hold that the facts of this case do not justify such an assertion of jurisdiction, and accordingly we reverse the order appealed from.

Plaintiffs are the executors of the estate of Harry Etra, a New York attorney who prior to 1977 suffered from a heart ailment characterized by arrhythmia. In January of 1977 Mr. Etra went to the Peter Bent Brigham Hospital in Boston, Massachusetts, where he came under the care and treatment of appellant. Doctor Lown is an attending physician at that hospital and a professor of cardiology at Harvard University School of Public Health, and is licensed to practice medicine in Massachusetts and Maryland. Although he maintains his practice solely within the State of Massachusetts, approximately one third of his patients come to him from outside of that State.

Mr. Etra's New York physician had referred him to Dr. Lown, a nationally recognized specialist in the treatment of heart disorders. After a regimen of therapy with other antiarrhythmics had failed, Lown suggested treatment with an experimental drug known as Aprindine. Dr. Lown was the clinical investigator for this drug, by arrangement with its manufacturer, Eli Lilly and Co. Although irrelevant for purposes of this appeal, we know that Mr. Etra signed a consent form for treatment with this drug, and that he responded positively to the therapy with it. Indeed, he was released from the hospital in February and provided with a supply of the drug to take back with him to New York. Since Etra did not wish to return to the care of his previous New York physician, Lown recommended

another New York doctor to him, Dr. Matta. Matta and Lown conferred by telephone and correspondence concerning Etra's continued use of the Aprindine. It is further alleged, and we deem it true for purposes of this appeal, that Lown shipped at least one renewal supply of Aprindine directly to Mr. Etra.

In April of 1977 Mr. Etra developed a fever and was admitted to the hospital by Dr. Matta. Among his symptoms was a depressed white blood cell count, and because of the possibility that this condition was related to the experimental drug, Matta discontinued the Aprindine on April 14, 1977. Mr. Etra died of cardiac arrest the following day. The underlying action was commenced six months later, alleging medical malpractice against Dr. Matta and Dr. Lown, and strict product liability against Eli Lilly and Co. The basis for jurisdiction against Dr. Lown was the attachment of a New York insurance policy. When it was subsequently discovered that no such policy existed, the complaint as to Dr. Lown was dismissed for lack of jurisdiction.

Dr. Matta thereafter brought a third-party action against Dr. Lown, serving him personally in Massachusetts and asserting CPLR 302 (subd [a], pars 1, 3, cl [ii]) as a jurisdictional predicate. Dr. Lown moved to dismiss the third-party complaint for lack of personal jurisdiction and defendant/third-party plaintiff Matta cross-moved to compel Lown to answer the third-party complaint without the affirmative defense of lack of personal jurisdiction. Special Term (per ANDREW TYLER, J.), denied the first and granted the second motion, finding that Lown's communication with Matta and the shipment of the Aprindine to Etra satisfied the requirements of CPLR 302 (subd [a], par 1), and that Lown's "tortious act of prescribing Aprindine in Massachusetts by which decedent was injured through his ingestion of Aprindine and subsequent death in New York", coupled with the significant percentage of Lown's gross income which was derived from private patients who resided outside of Massachusetts, satisfied the requirements of clause (ii) of paragraph 3 of the long-arm statute. Although we find Special Term's decision to be well reasoned and the question presented to be a close one, we cannot conclude that this defendant had those "certain

minimum contacts" with New York such "that the maintenance of this suit does not offend 'traditional notions of fair play and substantial justice'" (*International Shoe Co. v Washington,* 326 US 310, 316).

It can be argued persuasively, as done by Special Term here, that viewed in the light most favorable to third-party plaintiff, Dr. Lown's activity comes within the purview of the long-arm statute. Although we ultimately disagree with this analysis, we also note the command of the United States Supreme Court that "all assertions of state-court jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny." (*Shaffer v Heitner,* 433 US 186, 212.) "Although physical presence in New York is not a prerequisite for finding personal jurisdiction under the long-arm provisions of CPLR 302 (see *Parke-Bernet Galleries v Franklyn,* 26 NY2d 13; *Rothschild, Unterberg, Towbin v Thompson,* 78 AD2d 795), 'it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws' (*Hanson v Denckla,* 357 US 235, 253; *Ford v Unity Hosp.,* 32 NY2d 464, 471; *Longines-Wittnauer Watch Co. v Barnes & Reinecke,* 15 NY2d 443, cert den *sub nom. Estwing Mfg. Co. v Singer,* 382 US 905)." (*Cato Show Print. Co. v Lee,* 84 AD2d 947, 949.) It is not disputed that appellant maintains no office, business affiliations, nor does he own any real or personal property located in New York State. He did not solicit Etra as a patient nor did he, not being licensed in New York, agree to remain his attending physician. Certainly standing alone, appellant's treatment of or hospitalization of a New York resident cannot be deemed a purposeful act by which he availed himself of the privilege of conducting activities here, thus invoking the benefits and protections of this State's laws. (Cf. *Attanasio v Ferre,* 93 Misc 2d 661, 666, app dsmd for want of prosecution 68 AD2d 981.) Even though the "mere shipment" rule has been abrogated by the 1980 amendment to CPLR 302 (subd [a], par 1) (*West Mountain Corp. v Seasons of Leisure Int.,* 82 AD2d 931) the basis and motivation for Dr. Lown's relationship with either Etra or Dr. Matta are not such

that we find it reasonable to hold the mere shipment of Aprindine to Etra in New York to constitute the supply of goods within the meaning of that section of CPLR 302. Similarly, telephone calls and letters exchanged between Lown and Matta do not amount to the supply of services under that section. In other words, although most certainly appellant was paid for his services to Etra in Massachusetts, it does not appear to us to be the kind of activity which amounts to the transaction of business, such that the follow-up contacts with defendant and his New York doctor can be seen as an extension of prior business transactions. And, even if they were, these contacts into New York State were for Etra's benefit, and not for the purpose of transacting business in the State. (Cf. *Meyer v Gas Mags.*, 49 AD2d 864; see, also, *McKee Elec. Co. v Rauland-Borg Corp.*, 20 NY2d 377; see *Mayes v Leipziger*, 674 F2d 178 [CA2d, 1982]; *Perlman v Martin*, 70 Misc 2d 169, 171.)

Similarly, we disagree with the analysis finding jurisdiction under paragraph 3 of subdivision (a), since the finding that Dr. Lown derives substantial revenue from interstate commerce rests upon the assumption that his income from treating patients who come from outside Massachusetts *to him* constitutes doing business on an interstate level. While clearly appellant is alleged to have committed a tortious act outside of the State causing injury in the State, and he most likely should have expected his acts to have consequences in the State from whence his patient came, the treatment of unsolicited patients in one's own home State should not support the imputation of interstate commercial activity. (Accord *Hutton v Piepgras*, 451 F Supp 205 [US Dist Ct, SDNY, 1978, DUFFY, J.]; cf. *Porcello v Brackett*, 85 AD2d 917, 918, affd 57 NY2d 962; *Wiess v Greenberg, Traurig, Askew, Hoffman, Lipoff, Quentel & Wolff*, 85 AD2d 861.)

Of course, it might be a different thing entirely were we discussing the amenability of the manufacturer to long-arm jurisdiction (assuming it were not otherwise subject to jurisdiction here). As distinguished from the Massachusetts physician, the manufacturer seeks only the commercial exploitation of its product, and relies upon the data gathered by its agent (Dr. Lown) and the experimental

treatment of prototypical patients such as Mr. Etra. "The differences between individuals and corporations may, of course, lead to the conclusion that a given set of circumstances establishes state jurisdiction over one type of defendant but not over the other." (*Shaffer v Heitner,* 433 US 186, 204, n 19, *supra.*) However, that is not the question we are presented with on this appeal. (Cf. *Cato Show Print. Co. v Lee,* 84 AD2d, at p 949 ["the activities of a representative of a nondomiciliary in New York (Dr. Matta) will be attributed to the nondomiciliary for the purpose of long-arm jurisdiction if the nondomiciliary requested the performance of those activities in New York, and those activities benefit it, regardless of whether the representative acted as an agent or an independent contractor"].)

However, because this is a case of seemingly first impression for the courts of this State, it is necessary to point out what we do not hold. We do not find, as appellant would have us, that it is against public policy to hold an out-of-State physician jurisdictionally available for suit in this State if the hands-on treatment is rendered without the physical border. There is no force to the admonishment that out-of-State physicians will refuse to treat New Yorkers if they are not provided a blanket protection from lawsuits instituted here. Such a rule would unnaturally insulate one class of professionals who might very well, on a given set of facts, have sufficient contacts with New York and competent and clear awareness that their deeds may bedevil New York citizens. (Cf. *S. R. v City of Fairmont,* 280 SE2d 712 [W Va].) Instead, we merely hold that to find a jurisdictional predicate under CPLR 302 would "offend traditional notions of fair play and substantial justice" prohibited by the United States Constitution (*International Shoe Co. v Washington, supra*), or, to use the words of District Judge DUFFY in a somewhat analogous case, it "would simply be unreasonable." (*Hutton v Piepgras,* 451 F Supp 205, 209, *supra.*)

Accordingly, the order entered November 12, 1982 in Supreme Court, New York County (ANDREW TYLER, J.), is reversed on the law, third-party plaintiff's motion is denied and appellant's motion to dismiss the third-party complaint under CPLR 3211 is granted, without costs.

KUPFERMAN, J. P. (dissenting). The facts are well set forth in the majority opinion by CARRO, J., and the dissenting opinion by Ross, J.

While the problem of jurisdiction and the merits of the substantive legal point are separate questions, it may help to put the matter in perspective.

It is clear that the decedent initially went to Massachusetts for treatment by Dr. Lown with Aprindine, and that, when he returned to New York, he was treated by codefendant Dr. Matta by referral from Dr. Lown. The real problem here is the third-party complaint that Dr. Matta has against his mentor Dr. Lown, rather than the relationship between the plaintiff and Dr. Lown. Drs. Matta and Lown seem to have had a continuing relationship, which should lend itself to jurisdiction pursuant to CPLR 302 (subd [a]).

Ross, J. (dissenting). We would affirm.

Dr. Bernard Lown (Lown) is licensed to practice medicine in Massachusetts and Maryland. He is a nationally and internationally known cardiologist. Besides being a professor of cardiology at Harvard University's School of Public Health, he heads his own laboratory, which is called the "Lown Cardiovascular Laboratory" and is located at Harvard. In exchange for compensation received from commercial drug companies, this laboratory does research in connection with experimental drugs.

Aprindine is an experimental drug manufactured by defendant Eli Lilly & Company (Lilly). Sometime in 1975, Lilly hired Lown to act as a clinical investigator to test the effects of Aprindine upon human beings. It is undisputed that only a clinical investigator can dispense Aprindine because the drug is only made available to clinical investigators and only under controlled conditions. Lown testified, at his examination before trial, that:[*] "We kept a limited supply of the drug at Harvard for which we had to give a very precise accounting to Eli Lilly because every pill had to be accounted for."

Aprindine was developed to treat heart rhythm disorders. Some of its side effects are dizziness, tremors and changes in the electrocardiogram. In view of the fact that

---

[*] All references to testimony by Lown are from his examination before trial.

unforeseen side effects can occur in a patient being treated by Aprindine, it is necessary to watch such patients closely, since frequent blood tests and electrocardiograms may be needed.

Plaintiffs' decedent, Harry Etra (Etra), who was a Manhattan resident, intentionally journeyed to Boston, Massachusetts, in January, 1977 to be treated with Aprindine by Lown for cardiac arrhythmia. While in Boston, Etra was admitted as a patient to the Peter Bent Brigham Hospital, and Lown was the responsible physician of record. Etra was started on a course of treatment, which included ingestion of Aprindine. There is no dispute that Lown was paid for the professional services he provided Etra, which payment was separate and apart from the payment he received from Lilly as a clinical investigator. In other words, by being paid by both patient Etra and Lilly, Lown was serving two masters simultaneously, whose objectives did not necessarily coincide.

Upon his discharge from the hospital in February, 1977, Etra was given a supply of Aprindine to take back with him to New York. In New York, Etra continued to ingest this drug and Lown continued to supply it to him. Lown testified: "his [Etra's] life was jeopardized by even discontinuing the drug for the briefest duration".

Examination of the record reveals that, in addition to furnishing Aprindine to Etra, Lown kept in close touch with Etra's case from the time he left Boston in February, 1977 until Etra died in New York on April 15, 1977. For example, Lown's office corresponded with Etra's New York physician, defendant and third-party plaintiff Raymond Matta (Matta), whom Lown had recommended; in March, 1977, Etra returned "to Boston to seek further advice about the management of arrhythmia;" and, as Etra was dying in New York, Lown admitted he spoke by telephone with Etra's wife relative to Etra's declining physical condition.

Based upon these uncontested facts, we find that Lown had forged a relationship with Etra that Lown could not break, even if Lown did not actually step into New York State during this period. Lown testified: "Our function is to establish a proper diagnosis and to institute a program of

management and to advise the physician the reason for the diagnosis and the basis for the management that has been instituted, with the understanding that if problems arise, that the patient be referred back to us for correction."

Lown's status as a clinical investigator places him in a completely different position, in respect to the long-arm jurisdiction of New York, than that of a medical specialist located in an out-of-State city, who a New Yorker visits simply for an opinion and which consultation is the entire extent of their contact.

The majority holds that the "basis and motivation for Dr. Lown's relationship with either Etra or Dr. Matta are not such that we find it reasonable to hold the mere shipment of Aprindine to Etra in New York to constitute the supply of goods within the meaning of that section of CPLR 302. Similarly, telephone calls and letters exchanged between Lown and Matta do not amount to the supply of services under that section. In other words, although most certainly appellant was paid for his services to Etra in Massachusetts, it does not appear to us to be the kind of activity which amounts to the transaction of business". In view of the facts in this case, we must disagree with this conclusion of the majority. In our opinion, "[t]he mere fact that the defendant [Lown] was able to arrange to conduct his extensive and purposeful activity in New York without having to physically come here does not enable him to avoid the jurisdiction of our courts" (*Parke-Bernet Galleries v Franklyn,* 26 NY2d 13, 19).

In order to underscore the "purposeful activity" of Lown that took place in New York, as a result of his supplying Aprindine to Etra from Boston, we quote this excerpt from the majority opinion: "In April of 1977 Mr. Etra developed a fever and was admitted to the hospital by Dr. Matta. Among his symptoms was a depressed white blood cell count, and because of the possibility that this condition was related to the experimental drug, Matta discontinued the Aprindine on April 14, 1977. Mr. Etra died of cardiac arrest the following day."

CPLR 302 (subd [a], par 3, cl [ii]) holds that a nondomiciliary is subject to New York jurisdiction when he "commits a tortious act without the state causing injury to [a]

person * * * within the state * * * if he * * * expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce". After measuring Lown's activities in the instant case against this subdivision of CPLR 302, we are compelled to find that Lown "cannot now claim that it was not reasonably foreseeable that someday [he] might have to defend [himself] in the courts of this State" (*Prentice v DeMag Material Handling,* 80 AD2d 741, 742). Also, Lown testified that he derives a significant portion of his income from interstate and international commerce, to wit, between approximately 1976 and 1981: one third of Lown's patients came from outside of Massachusetts; and, annually he gave about 20 lectures a year outside of Massachusetts in other parts of the United States as well as in Western Europe, Latin America, Asia, Australia, and the Middle East. As the court wrote in *Path Instruments Int. Corp. v Asahi Optical Co.* (312 F Supp 805, 810 [US Dist Ct, SDNY, MANSFIELD, J.]: "The 'substantial revenue' provision of § 302 (a) (3) (ii) is intended to extend the jurisdiction of New York courts to those defendants committing out-of-state tortious acts with repercussions in New York, who, because of the extent and non-local nature of their operations, can consistently with the requirements of fundamental fairness be expected to defend lawsuits in foreign forums."

Based on the facts in this case, we must disagree with the majority's conclusion.

There is no doubt that long-arm jurisdiction can be applied to tort, as well as contract actions (*Singer v Walker,* 15 NY2d 443, cert den *sub nom. Estwing Mfg. Co. v Singer,* 382 US 905; *Goldberg v Empire Fire & Mar. Ins. Co.,* 79 AD2d 533).

Lown's testimony sets forth his agreement to supply deceased with Aprindine in New York and since Lown was the clinical investigator for Lilly, he was required to report to Lilly with reference to the efficacy of the drug, as well as its side effects. This he could only obtain from the decedent in the State of New York. Therefore, it is reasonable to find that his actions availed to him the privilege of furthering his practice in New York.

In this case, our exercise of in personam jurisdiction over Lown fully complies with the principles of due process (*International Shoe Co. v Washington,* 326 US 310; *Hanson v Denckla,* 357 US 235).

Asch and Silverman, JJ., concur with Carro, J.; Kupferman, J. P., and Ross, J., dissent in separate opinions.

Order, Supreme Court, New York County, entered on November 12, 1982, reversed, on the law, third-party plaintiff's motion denied and appellant's motion to dismiss the third-party complaint under CPLR 3211 granted, without costs and without disbursements.