90 N.Y.2d 592 (1997)
687 N.E.2d 1293
665 N.Y.S.2d 10
Richard H. Ingraham, Individually and as Executor of Alison S. Ingraham, Deceased, Appellant,
v.
James Carroll et al., Defendants, and Frederick Loy, Respondent.
Court of Appeals of the State of New York.
Argued September 11, 1997
Decided October 21, 1997.
Beck, Salvi, Gewurz & Strauss, P. L. L. C., Garden City (Leland Stuart Beck of counsel), for appellant.
Donohue, Sabo, Varley & Armstrong, P. C., Albany (Kathleen L. Werther of counsel), for respondent.
Chief Judge KAYE and Judges TITONE, SMITH and WESLEY concur with Judge LEVINE; Judge BELLACOSA dissents and votes to reverse in a separate opinion in which Judge CIPARICK concurs.
*594 LEVINE, J.
Appellant commenced this wrongful death action seeking damages related to the injuries sustained by his late wife, Alison S. Ingraham, allegedly as a result of the negligence and medical malpractice of respondent Dr. Frederick Loy and two other physicians, Dr. James Carroll and Dr. Jon Porter. The uncontroverted facts, as set forth in the parties' papers, are as follows.
Respondent Loy is a vascular surgeon who practices and resides in Vermont. Although respondent also is licensed to practice medicine in New York, he does not maintain an office in New York or solicit business in this State. His private medical *595 practice is limited to Vermont, where he treats patients in Bennington and performs surgery at South Western Vermont Medical Center, also located in Bennington.
Appellant's decedent was a patient of Community Health Plan (hereinafter CHP), a New York HMO with a clinic located in Hoosick Falls, New York, where decedent was under the care of CHP physicians Carroll and Porter. On several occasions, decedent's CHP physicians referred her to respondent for a consultation in Bennington, which is close to the New York State border. Respondent is not under contract with CHP for consultation services. However, respondent frequently sees CHP patients on an ad hoc/fee-for-service basis, on referral from both the CHP Hoosick Falls facility and a CHP facility located in Bennington.
Pursuant to a written referral by her New York physicians, decedent first traveled to Vermont to see respondent on March 7, 1994, for consultation regarding decedent's complaint of a nodule in her right breast. Decedent was again referred to respondent and, on August 17, 1994, was seen by him in response to her CHP physicians' concern about a nodule in her left armpit. After each examination, respondent sent instructions to decedent's CHP physicians to withhold any invasive procedure to ascertain the nature of the nodule, but merely to observe it periodically. The third time that respondent saw decedent, on March 14, 1995, it was again with regard to the lump in decedent's left armpit. At this point, respondent made arrangements to remove the nodule. He subsequently performed that surgery at South Western Vermont Medical Center and discovered that the nodule contained metastatic malignant melanoma cells.
The gravamen of appellant's complaint against respondent is that he negligently failed to recognize the serious nature of his wife's condition at an earlier stage and, as a result, made recommendations to her primary physicians against procedures that would have led to an earlier diagnosis of the cancer while it was still in a treatable stage. Because of this allegedly tortious diagnosis and recommendation, appellant asserts that decedent was injured in New York when her untreated cancer spread there and eventually caused her death.
At Supreme Court, appellant moved to strike respondent's affirmative defense of lack of personal jurisdiction, relying exclusively on the long-arm jurisdiction provisions of CPLR 302 (a) (3).[1] *596 Supreme Court granted respondent's motion for dismissal for lack of personal jurisdiction on the ground that decedent's injury occurred in Vermont, rather than in New York, as required under CPLR 302 (a) (3). The Appellate Division affirmed (235 AD2d 778), agreeing with Supreme Court that appellant had failed to establish that respondent's allegedly tortious act outside of the State resulted in injury within the State. We granted appellant leave to appeal, and now affirm for reasons other than those relied upon below.
CPLR 302 (a) (3), the provision of New York's long-arm statute at issue here, permits a court to exercise personal jurisdiction over a nondomiciliary who:
"3. commits a tortious act without the state causing injury to person or property within the state * * * if he
"(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
"(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce" (CPLR 302 [a] [3] [emphasis supplied]).
Under this provision, the appellant must show both that an injury occurred "within the state," and that the elements of either clause (i) or (ii) have been satisfied. It is appropriate to point out that establishment of long-arm jurisdiction in connection *597 with a New York injury under either clause does not implicate constitutional due process concerns. "[T]he subdivision [302 (a) (3)] was not designed to go to the full limits of permissible jurisdiction. The limitations contained in subparagraphs (i) and (ii) were deliberately inserted to keep the provision `well within constitutional bounds'" (1 Weinstein-Korn-Miller, NY Civ Prac ¶ 302.14, quoting 12th Ann Report of NY Jud Conf, at 341; see also, McGowan v Smith, 52 N.Y.2d 268, 274). Thus, in this case, we are bound by a limitation more stringent than any constitutional requirement  the specific requirements of CPLR 302 (a) (3).
Assuming, without deciding, that the alleged tortious conduct in Vermont caused injury within New York, the issue before us is whether appellant has successfully demonstrated that either the first or second jurisdictional subset of CPLR 302 (a) (3) has been met. Because we conclude that appellant has failed to satisfy the requirements of either clause (i) or (ii) of CPLR 302 (a) (3), we hold that the complaint against respondent was properly dismissed.
Subdivision (a) (3) (i) requires the party seeking to obtain jurisdiction to demonstrate that the tortfeasor "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state" (CPLR 302 [a] [3] [i] [emphasis supplied]). By this provision, the Legislature limited CPLR 302 (a) (3) (i) jurisdiction to extend only to those "who have sufficient contacts with this state so that it is not unfair to require them to answer in this state for injuries they cause here by acts done elsewhere" (12th Ann Report of NY Jud Conf, at 343). Thus, CPLR 302 (a) (3) (i) necessitates some ongoing activity within New York State (see, id. [stating that "a regular course of conduct in the state is required" (emphasis supplied)]; see also, Allen v Canadian Gen. Elec. Co., 65 AD2d 39, 40 [analyzing CPLR 302 (a) (3) (i) in terms of activity conducted within New York State], affd for reasons stated 50 N.Y.2d 935). Although clause (i) does not require the quantity of New York contacts that is necessary to obtain general jurisdiction under the "doing business" test of CPLR 301 (see, id., at 343, n; see also, Siegel, NY Prac § 88, at 136 [2d ed]), it does require something more than the "one shot" single business transaction described in CPLR 302 (a) (1) (12th Ann Report of NY Jud Conf, at 343).
Here, appellant has made no showing that respondent "regularly does or solicits business * * * in the state" or "engages *598 in any other persistent course of conduct * * * in the state" or "derives substantial revenue from goods used or consumed or services rendered[] in the state" (CPLR 302 [a] [3] [i] [emphasis supplied]). Indeed, it is undisputed that respondent practices only in Vermont. He neither treated decedent in New York, nor contracted to provide services in New York or solicited business in New York. Thus, the requirements of clause (i) have not been met.
A much closer question is presented under clause (ii) of CPLR 302 (a) (3). This provision requires the satisfaction of two prongs. To establish jurisdiction, a plaintiff must demonstrate that the nonresident tortfeasor: (1) "expects or should reasonably expect the act to have consequences in the state"; and (2) "derives substantial revenue from interstate or international commerce" (CPLR 302 [a] [3] [ii]). The first prong is intended to ensure some link between a defendant and New York State to make it reasonable to require a defendant to come to New York to answer for tortious conduct committed elsewhere. The nonresident tortfeasor must expect, or have reason to expect, that his or her tortious activity in another State will have direct consequences in New York (see, Fantis Foods v Standard Importing Co., 49 N.Y.2d 317, 326; Sybron Corp. v Wetzel, 46 N.Y.2d 197, 206; cf., Martinez v American Std., 91 AD2d 652, 653, affd for reasons stated 60 N.Y.2d 873).
The first prong of CPLR 302 (a) (3) (ii) has been satisfied. Respondent concededly was aware that decedent, a New York resident, was receiving treatment from New York State primary physicians based, at least in part, on his recommendations. He contacted decedent's physicians directly, by mail and via telephone, concerning the treatment she was to receive in New York. Significantly, respondent acknowledged that his expectation, when making recommendations, is that the CHP doctor in New York would follow his advice. Hence, respondent, in essence, has admitted that his allegedly tortious action (a misdiagnosis and improper recommendation) would have consequences within New York, satisfying the first prong of CPLR 302 (a) (3) (ii).
Thus, personal jurisdiction over respondent ultimately turns on whether he "derives substantial revenue from interstate or international commerce," the indispensable second prong of subdivision (a) (3) (ii). Unlike clause (i), the "interstate commerce" prong of clause (ii) requires no direct contact with New York State (see, Siegel, op. cit., at 136). It is the first prong of clause (ii) (the expectation of New York consequences) that *599 ensures that the defendant has some direct contact with New York State. The substantial interstate commerce revenue component, on the other hand, narrows the long-arm reach to preclude the exercise of jurisdiction over nondomiciliaries who might cause direct, foreseeable injury within the State but "whose business operations are of a local character" (12th Ann Report of NY Jud Conf, at 342-343 [describing the interstate commerce prong of CPLR 302 (a) (3) (ii) as requiring a showing that defendant "was engaged in extensive business activities on an interstate or international level" (emphasis supplied)]; see also, Siegel, op. cit., at 136 [describing CPLR 302 (a) (3) (ii) as a "bigness requirement" designed to assure that the defendant is "economically big enough" to defend suit in New York]).
There is some support for the notion that the provision of medical services may never meet the definition of "commerce" for jurisdictional purposes (see, Markham v Gray, 393 F Supp 163, 166 [suggesting that the profession of medicine is not commerce under CPLR 302 (a) (3) (ii)], affd on other grounds sub nom. Markham v Anderson, 531 F.2d 634, 637; see also, People v Roth, 52 N.Y.2d 440, 448 [holding that the provision of medical services is not "commerce" for the purposes of applying the Donnelly Act]). We need not, however, decide so broad an issue today. Here, because respondent renders medical services wholly within his own State, he cannot be said to be engaging in interstate commerce (see, Etra v Matta, 94 AD2d 581, 585, affd 61 N.Y.2d 455; see also, Markham v Gray, supra, at 166).
The situation where a local physician treats a nonresident patient is by no means uncommon. For example, local physicians may treat nonresident patients traveling on vacation, or, as in this case, because the physician's office is located close to a State border. Perhaps the most common example is where a physician is so outstanding a specialist in a particular field as to attract numerous referrals from other physicians. Such a physician may treat patients from many different States on a daily basis.
The diversity of a physician's pool of patients, without more, cannot convert an otherwise local practice to an interstate business activity. A physician does not sell his or her services in interstate commerce by treating unsolicited patients that travel into the physician's home State seeking health care. Indeed, to the physician, the patient's residence is largely irrelevant to the provision of medical services. Unlike a manufacturer who introduces a product into the stream of commerce expecting it to be sold in other States, a physician treating *600 patients in his or her home State is providing a service that is inherently personal, and local, in nature. Undisputably, all of respondent's revenue is derived from such local medical services, provided in Vermont. In this respect, respondent's revenue is even less interstate in character than that of a renowned medical specialist, the bulk of whose income may be earned from treating out-of-State patients (see, Etra v Matta, 94 AD2d, at 585, supra). Thus, in terms of the substantial revenue from interstate commerce requirement of subdivision (a) (3) (ii), the existence of nothing more than an informal, even if frequent, referral practice from a New York HMO is insufficient, as is the fact that respondent holds an apparently completely unexercised privilege to practice medicine in New York.[2]
Accordingly, the order of the Appellate Division should be affirmed, with costs.
BELLACOSA, J. (dissenting).
We would reverse and deny the defendant's motion to dismiss the plaintiff's complaint containing causes of action for his deceased wife's pain and suffering and for her wrongful death. New York's long-arm jurisdictional nexus under CPLR 302 (a) (3) (ii) provides enough liberality to withstand dismissal of the lawsuit against the Vermont-based defendant, Dr. Frederick Loy, for his alleged fatal malpractice against plaintiff's spouse.
Under the factual circumstances as the parties have developed this pretrial, pleadings-type motion record, this case may proceed to resolution of the long-arm jurisdiction question on the assumption that some tortious injury to the plaintiff's deceased spouse merely is deemed to have occurred in New York. Thus, we accept the majority's prudential avoidance of the place-of-injury issue. Nevertheless, we respectfully dissent from a pivotal part of the ultimate analysis that also leads us to differ and vote for reversal.
The Vermont doctor "expects or should reasonably expect [his examinations in Vermont from which he dispatches written diagnostic findings and recommended treatment modalities *601 back to the New York referring HMO primary care doctor] to have consequences in [New York]" (CPLR 302 [a] [3] [ii]). New York is where the patient resided and returned for her medical care. Indeed, the Vermont doctor expressly acknowledged facts in satisfaction of that prong of the statute's criteria in his deposition before trial.
The interstate commerce element of clause (ii) of CPLR 302 (a) (3) presents a closer and more nuanced issue (this is our key divergence). Several factors, however, convince us of the greater cogency of plaintiff's legal position in this regard.
First, the defendant examined the plaintiff's spouse, Alison Ingraham, eight times, albeit in Vermont, over the course of a year on a manifestly regularized referral basis directly from New York primary care physicians, through their employer New York health maintenance organization (HMO), the Community Health Plan (CHP).
Second, the professional services rendered by defendant to plaintiff's spouse included a surgical specialty that ordinarily generates relatively higher professional medical revenues. This is demonstrated by the treatment and surgical regimen rendered to Mrs. Ingraham by defendant during her last visits to him in early 1995. Her first visit to him was in March 1994, and she died in November 1995.
Third, the defendant doctor, who holds a New York State medical license, was regularly engaged in a more extensive patient referral practice through the New York HMO, as his deposition testimony confirms. He thus derived the financial rewards from that opportunity to provide higher revenue-generating specialized services on a "fee for service provider" basis, according to his description. The nisi prius motion court could ordinarily make appropriate findings and inferences as to the fee and service arrangements, but it never reached that statutory criterion, nor its predicate fact development in this case.
HMO and primary-to-specialist medical referrals and methodologies today quintessentially reflect a managed care commercial enterprise that cannot be conventionally characterized on this record, or generally, as "inherently personal" or genuinely "local" (majority opn, at 600; see, e.g., Markham v Anderson, 531 F.2d 634, 637; Etra v Matta, 94 AD2d 581, affd 61 N.Y.2d 455; Battista v American Inst. for Mental Studies, 183 AD2d 416). Medical services are becoming increasingly business-driven and managed. Functionally, interrelated levels *602 of professional services with their impersonal referral formalities, bear readily identifiable indicia and price tags of both an interstate professional transaction and an intertwined commercial "arrangement," the word used by Dr. Loy to describe the professional relationship at issue and under which he took New York referrals through the HMO.
We distinguish here any separate referral "formal contract" by anyone with the Vermont physician and are puzzled in this connection by the majority's seeming insistence and implication that the absence of the formalism of an express contract exempts this case from long-arm jurisdiction. Here, a course of conduct and regular dealing are present and sufficient to satisfy the statutory fulcrum of this case that the Court makes dispositive (contrast, majority opn, at 600; compare, McLenithan v Bennington Community Health Plan, 223 AD2d 777, lv dismissed 88 N.Y.2d 1017; see also, CPLR 302 [a] [3] [i]). Notably, it also appears that no other statutory channels for acquiring jurisdiction over Dr. Loy in New York are properly before us.
In any event, based on the combination and relatedness of the factors of this case (not on any single one of them) and based on realistic inferences that could be properly drawn from the record material, we thus disagree with the majority's bottom line, reached evidently as a matter of law, that this Vermont doctor "cannot be said to be engaging in interstate commerce" (majority opn, at 599). Plaintiff's complaint and record, though thin, are deprived of their rightful and usual procedural and inferential preferences. If given their due, plaintiff would meet the prima facie level of jurisdictional satisfaction for going forward with this case in the New York Supreme Court, Rensselaer County, where Dr. Loy was sued.
In sum, this record documents that defendant practiced and profited from an interstate, cross-borders medical services "arrangement," particularly as to this case and generally as to other patients in a concededly regular pattern. By encouraging the continuous stream of New York patient referrals and by returning his findings and recommendations for residential onsite treatment (or nontreatment equal to failure to treat) to the New York physician, all tied together through the New York HMO with the New York patient, defendant voluntarily subjected himself to the privileges and protections of New York in the constitutional jurisdictional sense. While that overriding feature is not in question here, it is pertinent to show that the physician impliedly injected himself into and drew upon *603 the increasingly commercial professional service economy of New York and, thus, readily subjected himself to the interstate component of CPLR 302 (a) (3) (ii) (see generally, International Shoe Co. v Washington, 326 US 310; see also, McGowan v Smith, 52 N.Y.2d 268, 272). The New York HMO played an arranged role in and towards the Vermont physician's services and ultimate economic benefit. Few aspects could be more commercial and interstate.
In addition, it is no answer to say that a lawsuit could have been brought in Vermont and, thus, no harm is done by dismissal of the New York action. The surviving spouse, or even the 38-year-old patient had she lived, should not be forced to travel the short distance from Hoosick Falls, New York, to Bennington, Vermont, to sue this doctor under these circumstances. After all, they were repeatedly shuttled across the border while she was alive so she could receive specialized medical care, only to be left to suffer the physical and psychological harm for the rest of her days in New York because of the doctor's missed and delayed diagnosis. He allegedly (deemed proven for purposes of this motion) failed to detect her breast cancer when early intervention by a simple biopsy might have helped her or even saved her life. In these circumstances, New York has its own rightful interest and legitimate power to protect and to provide judicial access here for the redress of wrongs to its residents and citizens. Plaintiff, as the estate representative for his wife's survivors (himself and their three young children), is entitled to pursue "their" day in a New York court for the pain and suffering and wrongful death she experienced in New York.
We return, then, to the procedural starting point of this case  the respective motions to dismiss and to strike the jurisdictional defense. The minimal inferences necessary to support long-arm jurisdiction could thus be found to satisfy the "derives substantial revenue" criterion of the statute (see, Siegel, NY Prac § 88, at 136 [2d ed] ["whether the sums involved are `substantial' requires a factual inquiry in each case in which the issue is raised"]). At the very least, there should be a denial of both motions and a remittal for further proceedings.
Although this record lacks the precise sums and allocations of income from defendant's practice in relation to the New York referrals, Dr. Loy's deposition testimony that he saw CHP patients on "almost a daily basis" should suffice, at this beginning litigation phase, to defeat this motion to dismiss (see, Gillmore v J. S. Inskip, Inc., 54 Misc 2d 218, 222 [defendant has *604 burden on motion to dismiss for lack of jurisdiction under CPLR 302 (a) (3) (ii) to show absence of substantial revenue]; Ronar, Inc. v Wallace, 649 F Supp 310, 316 ["(w)hether revenue is `substantial' under New York law is determined on both relative and absolute scales"]; Path Instruments Intl. Corp. v Asahi Opt. Co., 312 F Supp 805, 810 [even in a "marginal case" the nature of the business conducted may be of such a character to satisfy CPLR 302 (a) (3) (ii)]; see also, McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C302:23, at 111 ["if the defendant's New York income is substantial in either an absolute sense (i.e., a large sum of money) or in a relative sense (i.e., a large proportion of its revenues), it should be sufficient to support long-arm jurisdiction"]).
Substantiality in this regard is not narrowly penned in by the statute; thus, the range of what qualifies as "substantial revenue"  or relative "bigness"  should be approached with some latitude and liberality for jurisdictional inferences purposes (see, e.g., Allen v Auto Specialties Mfg. Co., 45 AD2d 331; Gonzales v Harris Calorific Co., 64 Misc 2d 287, 290 [1% of $2,000,000 is "substantial"], affd 35 AD2d 720; compare, New England Laminates Co. v Murphy, 79 Misc 2d 1025, 1028 [4% of $400,000 not "substantial" as a matter of law]; see also, Siegel, NY Prac § 88, at 136 [2d ed]).
The Court's avoidance of ruling on the conclusion of both lower courts that no injury occurred in New York is prudentially useful here because, in effect, we at least neutralize that negative finding by those courts. To be sure, the Court does not substitute the affirmative finding that some injury did occur in New York. Instead, a detour is taken around that question to await a more propitious and better assembled case, that may be otherwise determinative of outcome and contributive to the dispositional analysis and developing jurisprudence.
In our view, it is useful to note in passing, nonetheless, that the locus of injury for tort and long-arm jurisdictional purposes is more of an open question than the rigid response in law up to now has indicated, to wit, that injury is only at the situs of the originating and precipitating tortious wrong (see, e.g., McGowan v Smith, 52 N.Y.2d 268, supra; Carte v Parkoff, 152 AD2d 615; Hermann v Sharon Hosp., 135 AD2d 682; Kramer v Hotel Los Monteros, 57 AD2d 756). That standpat answer would not reflect a progressive reassessment as to where the law is or ought to be, based on this flexible springboard of long-arm jurisdiction, no less where differing, continuing or final injuries *605 may ultimately be determined to be sited for purposes of pain and suffering and wrongful death causes of action.
Lastly, we do not share the majority's policy expressions concerning the legal consequences potentially flowing from other kinds of medical service referrals (majority opn, at 599, 600). While these hypotheses are real concerns, they are very significantly distinguishable from the instant case. Moreover, they are not precedentially implicated by the case-specific rationale we propose under our dissenting analysis of the law and governing procedural protocols, as applied to this record. Indeed, it would seem preferable to eschew entirely any consideration of these nettlesome permutations, as the whole Court does in regard to the place-of-injury feature.
Our vote in this case is to reverse and deny the motion to dismiss the action.
Order affirmed, with costs.
NOTES
[1] In a reply affidavit on the motion before Supreme Court, appellant cited to McLenithan v Bennington Community Health Plan (223 AD2d 777, lv dismissed 88 N.Y.2d 1017) without articulating in any way that he was invoking CPLR 302 (a) (1), the "transaction of business" long-arm provision relied upon in that case. Thus, it is highly questionable whether appellant raised jurisdiction under CPLR 302 (a) (1) before Supreme Court, thereby preserving the issue for our review. In any event, this argument is not helpful to appellant. This provision of the long-arm statute extends jurisdiction to one who "transacts any business within the state or contracts anywhere to supply goods or services in the state" (CPLR 302 [a] [1]). As hereinafter discussed, there is no showing that respondent transacted any business within New York or that he had a contract to provide services within New York. Even if we were to agree with the apparent holding of McLenithan that the entry into a contract with a New York HMO, wherein mutual obligations were undertaken for the referral to and treatment by an out-of-State physician, constituted the transaction of business in New York State, there is no evidence whatsoever of any such contract in this case.
[2] Not before us is the question whether a referral/fee arrangement creating mutual obligations would constitute an interstate business activity or give rise to jurisdiction under a different long-arm provision (cf., McLenithan v Bennington Community Health Plan, 223 AD2d 777, supra) because there is absolutely no evidence of such an arrangement here. Indeed, the complete absence of record evidence of any such relationship between respondent and the New York HMO undermines the dissent's characterization of the referral practice as a "managed care commercial enterprise" (dissenting opn, at 601).