Bellacosa, J.
(dissenting). We would reverse and deny the defendant’s motion to dismiss the plaintiffs complaint containing causes of action for his deceased wife’s pain and suffering and for her wrongful death. New York’s long-arm jurisdictional nexus under CPLR 302 (a) (3) (ii) provides enough liberality to withstand dismissal of the lawsuit against the Vermont-based defendant, Dr. Frederick Loy, for his alleged fatal malpractice against plaintiffs spouse.
Under the factual circumstances as the parties have developed this pretrial, pleadings-type motion record, this case may proceed to resolution of the long-arm jurisdiction question on the assumption that some tortious injury to the plaintiffs deceased spouse merely is deemed to have occurred in New York. Thus, we accept the majority’s prudential avoidance of the place-of-injury issue. Nevertheless, we respectfully dissent from a pivotal part of the ultimate analysis that also leads us to differ and vote for reversal.
The Vermont doctor "expects or should reasonably expect [his examinations in Vermont from which he dispatches written diagnostic findings and recommended treatment modalities *601 back to the New York referring HMO primary care doctor] to have consequences in [New York]” (CPLR 302 [a] [3] [ii]). New York is where the patient resided and returned for her medical care. Indeed, the Vermont doctor expressly acknowledged facts in satisfaction of that prong of the statute’s criteria in his deposition before trial.
The interstate commerce element of clause (ii) of CPLR 302 (a) (3) presents a closer and more nuanced issue (this is our key divergence). Several factors, however, convince us of the greater cogency of plaintiffs legal position in this regard.
First, the defendant examined the plaintiffs spouse, Alison Ingraham, eight times, albeit in Vermont, over the course of a year on a manifestly regularized referral basis directly from New York primary care physicians, through their employer New York health maintenance organization (HMO), the Community Health Plan (CHP).
Second, the professional services rendered by defendant to plaintiffs spouse included a surgical specialty that ordinarily generates relatively higher professional medical revenues. This is demonstrated by the treatment and surgical regimen rendered to Mrs. Ingraham by defendant during her last visits to him in early 1995. Her first visit to him was in March 1994, and she died in November 1995.
Third, the defendant doctor, who holds a New York State medical license, was regularly engaged in a more extensive patient referral practice through the New York HMO, as his deposition testimony confirms. He thus derived the financial rewards from that opportunity to provide higher revenue-generating specialized services on a "fee for service provider” basis, according to his description. The nisi prius motion court could ordinarily make appropriate findings and inferences as to the fee and service arrangements, but it never reached that statutory criterion, nor its predicate fact development in this case.
HMO and primary-to-specialist medical referrals and methodologies today quintessentially reflect a managed care commercial enterprise that cannot be conventionally characterized on this record, or generally, as "inherently personal” or genuinely "local” (majority opn, at 600; see, e.g., Markham v Anderson, 531 F2d 634, 637; Etra v Matta, 94 AD2d 581, affd 61 NY2d 455; Battista v American Inst. for Mental Studies, 183 AD2d 416). Medical services are becoming increasingly business-driven and managed. Functionally, interrelated levels *602 of professional services with their impersonal referral formalities, bear readily identifiable indicia and price tags of both an interstate professional transaction and an intertwined commercial "arrangement,” the word used by Dr. Loy to describe the professional relationship at issue and under which he took New York referrals through the HMO.
We distinguish here any separate referral "formal contract” by anyone with the Vermont physician and are puzzled in this connection by the majority’s seeming insistence and implication that the absence of the formalism of an express contract exempts this case from long-arm jurisdiction. Here, a course of conduct and regular dealing are present and sufficient to satisfy the statutory fulcrum of this case that the Court makes dispositive (contrast, majority opn, at 600; compare, McLenithan v Bennington Community Health Plan, 223 AD2d 777, Iv dismissed 88 NY2d 1017; see also, CPLR 302 [a] [3] [i]). Notably, it also appears that no other statutory channels for acquiring jurisdiction over Dr. Loy in New York are properly before us.
In any event, based on the combination and relatedness of the factors of this case (not on any single one of them) and based on realistic inferences that could be properly drawn from the record material, we thus disagree with the majority’s bottom line, reached evidently as a matter of law, that this Vermont doctor "cannot be said to be engaging in interstate commerce” (majority opn, at 599). Plaintiffs complaint and record, though thin, are deprived of their rightful and usual procedural and inferential preferences. If given their due, plaintiff would meet the prima facie level of jurisdictional satisfaction for going forward with this case in the New York Supreme Court, Rensselaer County, where Dr. Loy was sued.
In sum, this record documents that defendant practiced and profited from an interstate, cross-borders medical services "arrangement,” particularly as to this case and generally as to other patients in a concededly regular pattern. By encouraging the continuous stream of New York patient referrals and by returning his findings and recommendations for residential on-site treatment (or nontreatment equal to failure to treat) to the New York physician, all tied together through the New York HMO with the New York patient, defendant voluntarily subjected himself to the privileges and protections of New York in the constitutional jurisdictional sense. While that overriding feature is not in question here, it is pertinent to show that the physician impliedly injected himself into and drew upon *603 the increasingly commercial professional service economy of New York and, thus, readily subjected himself to the interstate component of CPLR 302 (a) (3) (ii) (see generally, International Shoe Co. v Washington, 326 US 310; see also, McGowan v Smith, 52 NY2d 268, 272). The New York HMO played an arranged role in and towards the Vermont physician’s services and ultimate economic benefit. Few aspects could be more commercial and interstate.
In addition, it is no answer to say that a lawsuit could have been brought in Vermont and, thus, no harm is done by dismissal of the New York action. The surviving spouse, or even the 38-year-old patient had she lived, should not be forced to travel the short distance from Hoosick Falls, New York, to Bennington, Vermont, to sue this doctor under these circumstances. After all, they were repeatedly shuttled across the border while she was alive so she could receive specialized medical care, only to be left to suffer the physical and psychological harm for the rest of her days in New York because of the doctor’s missed and delayed diagnosis. He allegedly (deemed proven for purposes of this motion) failed to detect her breast cancer when early intervention by a simple biopsy might have helped her or even saved her life. In these circumstances, New York has its own rightful interest and legitimate power to protect and to provide judicial access here for the redress of wrongs to its residents and citizens. Plaintiff, as the estate representative for his wife’s survivors (himself and their three young children), is entitled to pursue "their” day in a New York court for the pain and suffering and wrongful death she experienced in New York.
We return, then, to the procedural starting point of this case — the respective motions to dismiss and to strike the jurisdictional defense. The minimal inferences necessary to support long-arm jurisdiction could thus be found to satisfy the "derives substantial revenue” criterion of the statute (see, Siegel, NY Prac § 88, at 136 [2d ed] ["whether the sums involved are 'substantial’ requires a factual inquiry in each case in which the issue is raised”]). At the very least, there should be a denial of both motions and a remittal for further proceedings.
Although this record lacks the precise sums and allocations of income from defendant’s practice in relation to the New York referrals, Dr. Loy’s deposition testimony that he saw CHP patients on "almost a daily basis” should suffice, at this beginning litigation phase, to defeat this motion to dismiss (see, Gillmore v J. S. Inskip, Inc., 54 Misc 2d 218, 222 [defendant has *604 burden on motion to dismiss for lack of jurisdiction under CPLR 302 (a) (3) (ii) to show absence of substantial revenue]; Ronar, Inc. v Wallace, 649 F Supp 310, 316 ["(w)hether revenue is 'substantial’ under New York law is determined on both relative and absolute scales”]; Path Instruments Intl. Corp. v Asahi Opt. Co., 312 F Supp 805, 810 [even in a "marginal case” the nature of the business conducted may be of such a character to satisfy CPLR 302 (a) (3) (ii)]; see also, McLaughlin, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C302:23, at 111 ["if the defendant’s New York income is substantial in either an absolute sense (i.e., a large sum of money) or in a relative sense (i.e., a large proportion of its revenues), it should be sufficient to support long-arm jurisdiction”]).
Substantiality in this regard is not narrowly penned in by the statute; thus, the range of what qualifies as "substantial revenue” — or relative "bigness” — should be approached with some latitude and liberality for jurisdictional inferences purposes (see, e.g., Allen v Auto Specialties Mfg. Co., 45 AD2d 331; Gonzales v Harris Calorific Co., 64 Misc 2d 287, 290 [1% of $2,000,000 is "substantial”], affd 35 AD2d 720; compare, New England Laminates Co. v Murphy, 79 Misc 2d 1025, 1028 [4% of $400,000 not "substantial” as a matter of law]; see also, Siegel, NY Prac § 88, at 136 [2d ed]).
The Court’s avoidance of ruling on the conclusion of both lower courts that no injury occurred in New York is prudentially useful here because, in effect, we at least neutralize that negative finding by those courts. To be sure, the Court does not substitute the affirmative finding that some injury did occur in New York. Instead, a detour is taken around that question to await a more propitious and better assembled case, that may be otherwise determinative of outcome and contributive to the dispositional analysis and developing jurisprudence.
In our view, it is'useful to note in passing, nonetheless, that the locus of injury for tort and long-arm jurisdictional purposes is more of an open question than the rigid response in law up to now has indicated, to wit, that injury is only at the situs of the originating and precipitating tortious wrong (see, e.g., McGowan v Smith, 52 NY2d 268, supra; Carte v Parkoff, 152 AD2d 615; Hermann v Sharon Hosp., 135 AD2d 682; Kramer v Hotel Los Monteros, 57 AD2d 756). That standpat answer would not reflect a progressive reassessment as to where the law is or ought to be, based on this flexible springboard of long-arm jurisdiction, no less where differing, continuing or final injuries *605 may ultimately be determined to be sited for purposes of pain and suffering and wrongful death causes of action.
Lastly, we do not share the majority’s policy expressions concerning the legal consequences potentially flowing from other kinds of medical service referrals (majority opn, at 599, 600). While these hypotheses are real concerns, they are very significantly distinguishable from the instant case. Moreover, they are not precedentially implicated by the case-specific rationale we propose under our dissenting analysis of the law and governing procedural protocols, as applied to this record. Indeed, it would seem preferable to eschew entirely any consideration of these nettlesome permutations, as the whole Court does in regard to the place-of-injury feature.
Our vote in this case is to reverse and deny the motion to dismiss the action.
Chief Judge Kaye and Judges Titone, Smith and Wesley concur with Judge Levine; Judge Bellacosa dissents and votes to reverse in a separate opinion in which Judge Ciparick concurs.
Order affirmed, with costs.